■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JUAN CASTRO, Appellant.—Judgment of the Supreme Court, New York County (Budd G. Goodman, J., at suppression hearing; Carol Berkman, J., at trial and sentence), rendered March 2, 1982, convicting defendant, after jury trial, of criminal possession of a weapon in the third degree and sentencing him, as a second felony offender, to an indeterminate term of 2½ to 5 years' imprisonment, affirmed.

The facts are set forth in the dissent. As the dissent concedes, the initial stop was justified as well as the questioning of the driver of the vehicle. The defendant was one of the passengers. *(See, People v McLaurin,* 120 AD2d 270.)

Applying the approach in *People v Leung* (68 NY2d 734, 736), we have a traffic violation, which justifies the stop, occurring at 1:00 A.M., with the cab driver being "nervous," which is an indication of a possible robbery problem, with the occurrence being in an area where there have been cab robberies, plus the passenger attempting to leave the scene, all of which "establishes the necessary reasonable suspicion that defendant had committed, or was about to commit a crime" so that the police officer was justified in stopping the defendant. Concur—Kupferman, J. P., Sullivan and Ross, JJ.

Milonas and Rosenberger, JJ., dissent in a memorandum by Rosenberger, J., as follows: Shortly before 1:00 A.M. on November 30, 1980, Police Officer Heber Dunkle and his partner, Sergeant John McCormick, were riding in a marked, 15-seat police van when they saw a medallion taxi make an illegal left turn from 110th Street onto Central Park West, passing on the wrong side of the traffic island and through a red light. The taxi proceeded through a second red light at 109th Street but stopped at the light at 108th Street.

The police van stopped behind the taxi and the driver was directed to pull the cab over to the curb. Defendant and another passenger were seated in the rear of the taxi. Sergeant McCormick walked to the left side of the taxi and engaged the driver in conversation, while Officer Dunkle stood by the right rear door.

After a brief discussion with the driver, which Officer Dunkle could not hear, Sergeant McCormick looked at his partner, then pointed over the roof of the cab to where the passengers were seated, indicating that Officer Dunkle should watch the passengers in the back seat. Officer Dunkle interpreted this to mean that there might be "some kind of difficulty" with the passengers. The rear window was closed and the officer could see only the silhouettes of the persons inside.

Officer Dunkle opened the right rear door for a better view of the passengers, whereupon defendant got out of the cab. Without a word being exchanged, defendant brushed or pushed past Officer Dunkle, who was blocking his path, and began to walk away. The officer reached out and grabbed defendant's arm to restrain him from leaving, however, defendant slapped his hand away. Still without saying a word, Officer Dunkle grabbed defendant again, more firmly this time, and pulled him back to the cab.

At this point, Officer Dunkle noticed what he deemed a "suspicious" bulge under defendant's vest at the front of his waistband. Believing that defendant might be armed, the officer placed his hand on the bulge and felt what seemed to be the handle of a revolver. Officer Dunkle lifted defendant's vest and removed a .38 caliber revolver from defendant's waistband.

At the suppression hearing, Sergeant McCormick testified that after the cab was pulled over he asked the driver for his license and registration, then said: "you know you went through a red light." To this the driver responded that he was "nervous". The sergeant stated that his experience indicated that when a cab driver is "nervous" it is because of the passengers. Moreover, the sergeant testified, there was a high incidence of cab robberies in that area. Sergeant McCormick asked the driver to step out of the cab and gestured to his partner to watch the passengers.

Once outside the taxi, the driver (a Rumanian immigrant whose English was not fluent) told Sergeant McCormick that he had picked up the two passengers in Queens and they had asked him to take them to 125th Street and St. Nicholas Avenue in Manhattan. En route, the men asked the driver to take them through Central Park at 95th and 96th Street. Although he feared that he might be robbed, the driver, nevertheless, acceded to the request. However, the park drive was closed for the weekend.

While the driver was relating this information to Sergeant

McCormick, the sergeant was unaware that anything was happening on the other side of the cab until his partner informed him that defendant had a gun.

The issue now before the court is whether the prosecution has established that there was sufficient predicate for Officer Dunkle's interference with defendant as he attempted to walk away from the taxi, his seizure of defendant and the subsequent search which revealed the weapon on defendant's person.

The court below found that the initial stop of the taxi was justified after the officers observed it commit moving traffic violations. With this, there is no dispute. Nor, is there any question that the officers acted properly in questioning the driver of the vehicle *(People v Robinson,* 115 AD2d 411, 413 [1st Dept 1985]; *People v Livigni,* 88 AD2d 386 [2d Dept 1982], *affd* 58 NY2d 894 [1983]; *see also, People v De Bour,* 40 NY2d 210 [1976]). However, the officers' testimony, when fully credited and given the benefit of all reasonable inferences, does not establish the requisite degree of justification for either the stop or the seizure of defendant, a passenger in the car for hire, as he was walking away from the car. This case is distinguishable from *People v McLaurin* (120 AD2d 270 [1st Dept 1986]), cited by the majority, in which, as the defendant opened the door of the vehicle in which he was a passenger, the police officer viewed a gun in the defendant's possession.

In *People v La Pene* (40 NY2d 210, 221, 223 [1976]), the companion case to *People v De Bour (supra),* the Court of Appeals gave a "synopsis" of "the gradation of police authority with respect to encounters with citizens in public places", which correlated "the degree of objectively credible belief with the permissible scope of interference." The police need only "some objective credible reason" for the minimal intrusion of approaching a citizen to request information. Such a request for information may be predicated on facts "not necessarily indicative of criminality" *(supra,* at 223).

However, there is nothing which requires that citizens so stopped must comply with the request for information; the police "have no right to compel them to answer." *(Davis v Mississippi,* 394 US 721, 727, n 6 [1969]; *see also, United States v Mendenhall,* 446 US 544 [1980]; *People v Howard,* 50 NY2d 583 [1980].) In order to justify a more intrusive interference "to gain explanatory information, but short of a forcible seizure" the police must have "a founded suspicion that criminal activity is afoot" *(People v La Pene, supra,* at 223; *see*

*also, People v Torres,* 115 AD2d 93, 97 [1st Dept 1986]). Here, however, Officer Dunkle did not address any questions to defendant, but acted immediately to prevent him, by use of force, from leaving the scene.

The Court of Appeals has held that before the police may exercise restraint over a defendant and not merely over the vehicle in which he has been riding, "there must be some articulable facts, which initially or during the course of the encounter, establish reasonable suspicion that the person is involved in criminal acts or poses some danger to the officers" *(People v Harrison,* 57 NY2d 470, 476 [1982]).

The People maintain that the circumstances herein gave the officers reason to believe that defendant was implicated in criminal activity, past, present or imminent. They point to the cab driver's reckless driving in the presence of a marked police van, his reply that he was "nervous", the time of night and the fact that the stop occurred in a "high-crime area". While they acknowledge that Officer Dunkle did not know what the driver had told his partner, they argue that he was, as a practical matter, entitled to rely on his partner's assessment of the situation which was nonverbally communicated to him. Even if this position is accepted, arguendo, the question then becomes whether Sergeant McCormick's assessment was well founded. To decide this, we must look at the objective facts on which it was based, as established by the testimony.

The sergeant's determination rested primarily on his prior police experience. While such experience is not to be discounted, intuitions based on experience must still have an "objective, credible" foundation. The Constitution forbids the police from acting on mere whim or caprice. *(See, Terry v Ohio,* 392 US 1 [1968]; *People v De Bour, supra,* at 219.)

An individual's presence in a "high-crime" area, it has been held, is not a sufficient basis for believing that that individual is about to engage in criminal activity. *(People v Howard, supra,* at 590; *People v Ocasio,* 119 AD2d 21, 25 [1st Dept 1986].)* Many law-abiding citizens have no choice but to work and live in so-called "high-crime" areas. Their right to be free from unwarranted governmental interference, from unreasonable searches and seizure, does not diminish when they enter or return to their community.

Nor does the cab driver's statement that he was "nervous" provide any more solid support for the sergeant's suspicion. The driver's generalized fear about the "high-crime" area which his passengers gave as their destination cannot convert

facts "susceptible of innocent interpretation" into evidence of criminal conduct *(People v Howard, supra,* at 590; *People v De Bour, supra,* at 216; *People v Torres, supra,* at 98). Moreover, defendant and his fellow passenger were, like any other passengers, entitled to change their destination en route without suddenly, and for no other reason, being suspected of criminal activity.

This analysis indicates that, up to the point where Officer Dunkle opened the door of the taxi and defendant stepped out, there was no predicate for any action by the police other than a request for information. However, no words were exchanged with defendant until after the weapon was seized; on this, the record is unequivocal.

The court below found that defendant's behavior—in brushing past Officer Dunkle after the officer opened the car door, and in slapping at the officer's hand when he attempted to grab him—was sufficiently "furtive" and "aggressive" to create a "great risk to the police officer."

This finding, however, ignores the fact that the officer had no constitutional authority to detain defendant at this point; that defendant was free to exercise his right not to answer questions, had any been asked, and to depart the scene. Here, it was the officer who escalated the encounter after defendant attempted to do what he had every right to do—to go about his business free from intrusive governmental interference.

Defendant's effort to exercise his right to walk away was not unduly aggressive; a slap on the wrist does not constitute a serious risk. Nor can it be said that defendant acted "furtively" by choosing to walk away from the scene. As the Court of Appeals declared in *People v Howard (supra,* at 592): "Defendant's flight, had there also been indicia of criminal activity, would have been an important factor in determining probable cause [citations omitted], but where, as here, there is nothing to establish that a crime has been or is being committed, flight, like refusal to answer, is an insufficient basis for seizure or for the limited detention that is involved in pursuit [citations omitted]." *(See also, People v Torres, supra,* at 98.)

Finally, the People maintain that the forcible restraint of defendant was necessary to prevent a possible misdemeanor, theft of services (Penal Law § 165.15), because the taxi driver had not been paid. However, the facts do not support this contention, given that defendant's fellow passenger was equally liable for the full fare and there was no indication that he was attempting to leave without settling accounts. At

most, the situation gave rise to a founded suspicion warranting some inquiry. However, no questions were asked to clarify the situation before the officer seized the defendant unlawfully.

Inasmuch as this encounter with defendant was unlawful from its inception, the evidence seized was tainted and should have been suppressed. *[See,* 113 Misc 2d 255.]