[792 NYS2d 472]

THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v MICHAEL THOMAS, Respondent.

First Department, April 14, 2005

APPEARANCES OF COUNSEL

*Robert M. Morgenthau, District Attorney*, New York City (*Frank Glaser* and *Rona Feinberg* of counsel), for appellant.
*Richard Verchick*, New York City, for respondent.

**OPINION OF THE COURT**

FRIEDMAN, J.

Under the four-tiered analysis of police-civilian encounters first propounded by the Court of Appeals in *People v De Bour* (40 NY2d 210, 223 [1976]), a level I "request for information"—the least intrusive level of police inquiry—is justified by an "objective, credible reason not necessarily indicative of criminality" (*People v Ocasio*, 85 NY2d 982, 985 [1995], citing *People v Hollman*, 79 NY2d 181, 187, 194 [1992]). The question presented by this appeal is whether the parking of a car beside a fire hydrant provides a police officer with an "objective, credible reason" to ask to see the driver's license of the person sitting at the wheel of the car. We conclude that the car's blocking the hydrant does create an "objective, credible reason" justifying the officer in making limited inquiries to determine whether the person behind the wheel is a licensed driver. The justification lies in the fact that it is not legal to stop a car beside a hydrant unless a licensed driver remains at the wheel (*see* Vehicle and Traffic Law § 1202 [b]; 34 RCNY 4-08 [e] [2]). In concluding that the officer is justified in asking to see the license, we are influenced by the consideration that a person who stops a car alongside a fire hydrant plainly invites, and should reasonably expect, an interaction with law enforcement. We also conclude that a police approach to a person in a car that is already stopped does not constitute a level III "forcible stop and detention" (*De Bour*, 40 NY2d at 223), even if the police stop their vehicle in a position that incidentally blocks the civilian vehicle's path. Accordingly, we reverse the order granting defendant's suppression motion, and reinstate his indictment.

The relevant facts are as follows. While on patrol in a marked police van, Police Officer Anthony Bombolino and his partner observed defendant sitting in the driver's seat of a car parked adjacent to a fire hydrant, with the car's motor running. Officers of the precinct had been instructed to "keep all the fire

hydrants clear" while on patrol, since blocked fire hydrants were a "major problem" in the area. Accordingly, Bombolino parked his van "directly in front of" defendant's car, got out of the van, and walked over to defendant, intending to ask him to move the car. First, however, Bombolino asked defendant for his driver's license. Defendant replied that he did not have his license with him. Bombolino then asked for another form of identification, and defendant stated that he had none. At that point, Bombolino asked defendant to state his name and date of birth, which defendant did. Bombolino's partner entered defendant's name and date of birth into a mobile computer, which yielded the information that defendant's license had been suspended. Bombolino then asked defendant to step out of his car and placed him under arrest for driving with a suspended license. In conducting a search of defendant's person incident to the arrest, Bombolino found in defendant's pants pocket a bag of crack cocaine and a dollar bill with cocaine residue on it.

Defendant was subsequently indicted for criminal possession of a controlled substance in the fifth degree and aggravated unlicensed operation of a motor vehicle in the third degree (Vehicle and Traffic Law § 511 [1] [a]). Defendant moved to suppress the drug evidence that Bombolino had recovered from his person. The only witness called at the suppression hearing was Officer Bombolino, who testified as indicated above. Supreme Court granted the motion. Although defendant's car had not been moving at any point during the encounter with the police, the court found that Officer Bombolino had stopped defendant by parking the police van "so as to block in the defendant." Noting that a state statute permits parking beside a fire hydrant, provided that a licensed driver remains in the front seat, prepared to move the vehicle "immediately" should the need arise (Vehicle and Traffic Law § 1202 [b]), the court found that Officer Bombolino did not have probable cause to believe that a traffic violation was occurring when he observed defendant sitting at the steering wheel of a car parked beside a fire hydrant.[1] Since Officer Bombolino did not have probable cause to suspect a traffic violation, the court reasoned, the "stop" of defendant's car (by parking the police van in front of it) was

---

1. The suppression court, which apparently did not question that Officer Bombolino was entitled to direct defendant to move his car away from the fire hydrant, overlooked the fact that Vehicle and Traffic Law § 1202 (b) has been superseded in New York City, pursuant to Vehicle and Traffic Law § 1642 (a) (2), by 34 RCNY 4-08 (e) (2). We and our dissenting colleagues appear to be in agreement that, for purposes of deciding this appeal, there are no substantively

unlawful. The court therefore suppressed the drug evidence recovered from defendant's person as the product of an unlawful "stop." We now reverse.

Initially, contrary to the view of the suppression court and Justice Tom, the evidence concerning the position in which the police van was parked did not escalate the degree of intrusion to that of a level III forcible stop requiring "reasonable suspicion" (see Ocasio, 85 NY2d at 984; Hollman, 79 NY2d at 185). Although Officer Bombolino testified on cross-examination that he parked the police van "directly in front of defendant's car," thereby "block[ing]" him, this does not constitute a seizure of a car already stopped (see Ocasio, 85 NY2d at 984-985 [affirming finding that no seizure occurred where police approached car stopped at red light]). It appears from the record that the blocking of the car was simply incidental to the legitimate police approach to the vehicle for the purpose of asking defendant to move it. The record provides no basis for a finding that the police deliberately stopped their vehicle in a position that would block the path of defendant's vehicle.[2]

Given the congested traffic conditions that prevail in many areas, we cannot conclude that a seizure occurs whenever the police, in stopping their own vehicle for the purpose of making a legitimate approach, incidentally block the path of the car of the person to whom they wish to speak. To hold otherwise, as advocated by Justice Tom, would impose on the police a new protocol requiring a motorized officer, in stopping to approach a person in a parked car, to take care to stop the police vehicle in a way that makes it possible for the other driver to pull away. According to Justice Tom, any failure to do this, whether intentional or (as here) unintentional, transforms the police ap-

significant differences between Vehicle and Traffic Law § 1202 (b) and 34 RCNY 4-08 (e) (2).

2. The portions of Officer Bombolino's testimony quoted by Justice Tom do not support Justice Tom's hypothesis that the police car was stopped for the specific purpose of blocking defendant's vehicle. To the contrary, such testimony is entirely consistent with the blocking having been incidental. Further, Justice Tom's apparent suggestion that Officer Bombolino never really intended to tell defendant to move his car is flatly contradicted by the officer's testimony (in response to the court's asking "what was your intention when you went to the car?") that "I wanted to make him move" away from the hydrant. On the facts, we find that the police did not purposefully block defendant's car; whatever blocking occurred was merely an incidental byproduct of a legitimate police approach.

proach into a level III forcible detention. We decline to adopt this approach.[3]

In concluding that the police approach to defendant in his already-stationary car constituted a level III stop, Justice Tom misplaces reliance on cases that, unlike this appeal, were concerned with the grounds required to justify the stop of a *moving* vehicle (*see People v May*, 81 NY2d 725, 727 [1992] [as defendant's car "pulled away," the police "ordered the car to pull over"]; *Sobotker*, 43 NY2d at 562 [the police used sirens and lights to force a car "to pull over and stop at the curb"]; *Ingle*, 36 NY2d at 415 [defendant, while "operating his 1949 Ford on Route 96A in Seneca County," was "caused (by the police) . . . to pull over to the side of the road"]; *People v Morrison*, 161 AD2d 608, 608 [1990] [the police forcibly stopped a car when they "pulled in behind the vehicle as it was attempting to leave" a parking lot, and then directed the driver to "shut the motor off"]; *People v Brown*, 112 AD2d 945, 945 [1985] [the police forcibly stopped a car by pulling up alongside it, and ordering the driver to turn off the engine, " (a)s it was leaving (its) parking space"]). Nor does Justice Tom's position find support in *People v Harrison* (57 NY2d 470 [1982]), which dealt with the grounds required to justify the police in ordering a person getting out of a car (which the instant defendant was not doing at the relevant time) to remain inside (*see id*. at 473 [defendant, who "had opened the door and was proceeding to get out of the car," was told by the police "to get back in the car"]).

Justice Tom also fails to distinguish *Ocasio* (85 NY2d 982 [1995]) convincingly. In *Ocasio*, as we more fully discuss at a later point in this writing, the defendant's car was stopped at a red light at the time the police approached to request information (*id*. at 983-984), and the Court of Appeals held that this

---

**3.** We note that Justice Ellerin, although not adopting the analysis of the suppression court and Justice Tom, goes astray by quoting language from *People v Williams* (79 AD2d 147, 150 [1981]) that refers to the grounds necessary to justify the stop of a *moving* vehicle for purposes of a license and registration check, not, as here, the grounds needed for checking the license of the occupant of a vehicle already stopped (and blocking a fire hydrant) at the time of the police approach. That the quoted language from *Williams* refers to the grounds required to stop a moving vehicle is demonstrated by the *Williams* court's immediately following citations (omitted from Justice Ellerin's quotation) to *People v Ingle* (36 NY2d 413 [1975]) and *People v Sobotker* (43 NY2d 559 [1978]), each of which deals with a stop of a moving vehicle. The actual holding of the *Williams* case concerns the propriety of a stop-and-frisk of an individual walking in the street (*see* 79 AD2d at 147-148), and has no bearing on the question presented by this appeal.

request was only a level I inquiry. Thus, like defendant's car in this case, the *Ocasio* vehicle was stationary prior to, and for a reason independent of, the action of the police. While the *Ocasio* court took note of the fact that the police in that case did not use "sirens or lights," and did not otherwise "prevent[ ] [the defendant] from departing" (*id.* at 984), the same is true in this case, given the absence of any evidence that the blocking of defendant's car was intentional, or that defendant was beginning to put his car back in motion, or to get out of the car, at the time the police asked him to show his license. Justice Tom's contention that the request for defendant's license was, in itself, sufficiently coercive to constitute a forcible stop, is inconsistent with *Ocasio*, where the fact that the persons requested to identify themselves were sitting in a vehicle that (unlike defendant's car here) was actually in the stream of traffic at the time of the request did not transform the encounter into a forcible stop. We note that, under Justice Tom's approach, any request for the license of a motorist in a parked car apparently would be deemed to constitute a level III forcible stop.[4]

Turning to the question on which we and Justice Ellerin disagree—whether Officer Bombolino's request to see defendant's license, granting that it was only a level I inquiry, found justification in an "objective, credible reason not necessarily indicative of criminality" (*Ocasio*, 85 NY2d at 985)—we conclude that the request for the driver's license did have such a justification. At the outset, we note that this Court, in *People v Gonzalez* (115 AD2d 73 [1986], *affd* 68 NY2d 950 [1986]), plainly stated that a car's being "stopped or standing at a fire hydrant," without more, "justified [police officers] in approaching to request information" from the car's occupants (115 AD2d at 82), i.e., to conduct a level I inquiry. There is no support in *Gonzalez* (which affirmed the suppression of evidence obtained through the search of a bag, not as a result of a request for information) for Justice Ellerin's view that it is improper for an officer to ask to see a driver's license before requesting that a car be moved away from a hydrant. While Justice Ellerin, like Justice Tom, attempts to distinguish *Gonzalez* based on the

---

4. Although footnote 3 of Justice Tom's opinion discusses the implications of the retention of a motorist's driver's license by the police, the record establishes that no such retention took place in this case. Since defendant did not have his driver's license with him during this incident, it was impossible for the police to retain his license. It was by entering defendant's name and date of birth into a mobile computer that the police ascertained that his license had been suspended.

decision's description of the car's standing at a hydrant as "a traffic infraction" (115 AD2d at 82), this is a matter of semantics. It remains indisputable that the basis for the initial police approach in *Gonzalez* was substantially the same set of concrete facts presented in this case—an occupied car that was stopped or standing adjacent to a fire hydrant.[5]

To the extent *Gonzalez* might not be deemed dispositive of this issue, we independently conclude that police officers are entitled to conduct a level I inquiry of a person at the wheel of a stationary car that is blocking a fire hydrant. Our analysis begins with the justification required for a level I inquiry, which, to reiterate, is "an objective, credible reason not necessarily indicative of criminality" (*Ocasio*, 85 NY2d at 985). Thus, a level I inquiry is properly predicated on observed circumstances that are susceptible to either an innocent explanation or an explanation involving illegality, as is demonstrated by the various situations that have been found to have justified level I inquiries in prior cases.[6] A police officer observing such circumstances is entitled to ask the person involved in the situation "basic, nonthreatening questions regarding, for instance, identity, address or destination" (*Ocasio*, 85 NY2d at 985, citing *Hollman*, 79 NY2d at 185, 191) for the purpose of determining whether there is any need for further investigation or action.

Where a person is found sitting at the wheel of a car blocking a fire hydrant, the police officer making the observation is entitled, as even the two dissents concede, to approach to ask the person to move the car. In addition, the officer is entitled to ask the person in the car "basic, nonthreatening questions" (*Ocasio, supra*) for the purpose of determining whether the car's presence beside the hydrant is lawful—which it is if the

---

**5.** We see no support in *Gonzalez* for the position, taken by the suppression court and Justice Tom, that the police executed a level III stop merely by asking to see defendant's driver's license while the police vehicle was stopped in a position that incidentally blocked the path of defendant's vehicle.

**6.** See e.g. *Ocasio* (85 NY2d at 983, 985 [defendant and another man drove up to a building known for drug dealing, looked up and down the street, entered the building, exited shortly thereafter, and drove away]); *Hollman* (79 NY2d at 185-186, 193 [after behaving oddly in a bus terminal, defendant boarded a bus and placed his bag on the overhead rack at a distance from his seat]); *Harrison* (57 NY2d at 475 [defendants' rental car was in an "extremely dirty condition"]); *De Bour* (40 NY2d at 220 [defendant crossed the street upon sighting police after midnight in a high crime area]); *People v Heston* (152 AD2d 999, 1000 [1989], *lv denied* 76 NY2d 858, 940 [1990] [defendant's car was parked with the dome light on, in an area frequently used for drinking and drug use]).

person at the wheel is a licensed driver—or, alternatively, unlawful—which it is if the person at the wheel is not a licensed driver. Of course, we do not suggest that a level I inquiry is warranted by the observation of any activity that, while apparently innocent on the surface, might theoretically involve illegality. A car standing at a fire hydrant presents a special circumstance, however, in that any reasonable person would understand that, for obvious reasons of public safety, stopping one's car beside a hydrant invites the attention of law enforcement. By thus implicitly inviting police attention, a person stopping a car beside a hydrant attenuates his or her privacy interest to the extent that it becomes appropriate for the police, upon approaching in order to direct the removal of the car, to make limited inquiries to ascertain that such person is a licensed driver.

As the Court of Appeals has recently reiterated, "whether police interference is reasonable requires a weighing of the government's interest against an individual's right to privacy and personal security" (*People v Wheeler*, 2 NY3d 370, 374 [2004], citing *De Bour*, 40 NY2d at 215). Given the lesser weight attaching to defendant's privacy interest as a result of his decision to stop his car beside the hydrant—or, stated otherwise, the reasonable expectation of interaction with the police that arose in the situation in which defendant had placed himself—we find that Officer Bombolino was entitled to make a level I inquiry for the purpose of determining defendant's license status.[7]

The foregoing demonstrates that Officer Bombolino had justification for making a level I inquiry of defendant in the performance of his role as an agent of law enforcement (*see Hollman*, 79 NY2d at 189-190, citing *De Bour*, 40 NY2d at 219-220). The officer also had justification for making the inquiry in the performance of his public service function, a role in which he had "wide latitude to approach people and ask for information" (*Hollman*, 79 NY2d at 189, citing *De Bour*, 40 NY2d at 218).[8] As Bombolino testified, patrol officers of the precinct had been

**7.** Needless to say, we reject Justice Tom's mischaracterization of our analysis as "a transparent attempt to justify the means by the end." Obviously, the discovery of grounds for defendant's arrest could not retroactively justify otherwise unlawful police conduct. Our reversal of the suppression order is, of course, based on the view that no unlawful police conduct occurred in this case.

**8.** Justice Ellerin evidently reads *Hollman*'s statement that "[the] public service approach for information is not the focus of *De Bour*" (79 NY2d at

instructed to "keep all the fire hydrants clear" because blocked hydrants were a "major problem" in the area. Accordingly, Bombolino lawfully approached defendant intending to ask him to move his car away from a hydrant. In our opinion, it is a matter of common sense that a police officer, before directing a person to operate a car not already in motion, should ascertain that the person in the car holds a driver's license; obviously, if the person does not hold a driver's license, the officer must make other arrangements for the removal of the car. In this regard, it is significant that a municipality may be exposed to liability if one of its police officers directs a person to move a car without first ascertaining that such person is a licensed driver (*see Persaud v City of New York*, 267 AD2d 220, 220-221 [1999]; *cf. Ohdan v City of New York*, 268 AD2d 86, 90 [2000], *lv denied* 95 NY2d 769 [2000], *appeal dismissed* 95 NY2d 885 [2000] [issue of city's liability for its traffic agent's direction to an unlicensed person to move the car in which he was sitting was properly submitted to the jury, although the jury found in favor of city]). Thus, Officer Bombolino's need to ensure that the person he intended to ask to move the car was a licensed driver provided another "objective, credible reason" for making a level I inquiry.

Justice Ellerin apparently wishes to deny the relevance of *Persaud* to the instant case on the ground that *Persaud*—a negligence case—does not address criminal law issues. Obviously, we do not cite *Persaud* as authority on the *De Bour* issues in this case, but to demonstrate the governmental interest in ascertaining the license status of a person whom a police officer

189) as a holding that the exercise of the public service function can never serve as the basis for a level I inquiry. This misstates the meaning of the quoted language, which the Court of Appeals intended as a correction of erroneous dicta in an earlier decision by this Court (*Matter of Antoine W.*, 162 AD2d 121 [1990], *affd* 79 NY2d 888 [1992]). Specifically, in the course of reversing the delinquency adjudication in *Antoine W.*, the majority of a panel of this Court asserted that *De Bour*, in discussing the first level of police inquiry, "has reference only to an 'informational' approach to a citizen by the police" (162 AD2d at 122), meaning that a level I inquiry could be justified *only* in the exercise of the public service function, and never in the exercise of the law enforcement function. In *Hollman* and the simultaneously issued affirmance of *Antoine W.*, the Court of Appeals rejected the analysis of this Court's *Antoine W.* majority, and (while nonetheless affirming this Court's *Antoine W.* result on other grounds [*see* 79 NY2d at 889]) reiterated that a police officer may, under appropriate circumstances, make a level I inquiry in carrying out the law enforcement function. Nothing in the Court of Appeals' decisions in *Hollman* or *Antoine W.* supports Justice Ellerin's view that the Court of Appeals has retracted *De Bour*'s recognition of the validity of a level I inquiry made in the course of a police officer's performance of the public service function.

intends to direct to operate a motor vehicle. Justice Ellerin seems to recognize that the failure of an officer to inquire to ascertain the license status of such a person may constitute actionable municipal negligence, but nonetheless would hold that the inquiry made for that purpose in this case was unlawful.

Having established that Officer Bombolino had grounds for making a level I inquiry, we further conclude that the officer's request to see defendant's driver's license, and his subsequent request for pedigree information that would allow him to ascertain defendant's license status, were within the proper bounds of that inquiry. Such requests are precisely the kind of nonthreatening, nonaccusatory questions that are appropriate in a level I police inquiry (*see Ocasio*, 85 NY2d at 985; *Hollman*, 79 NY2d at 185, 191; *People v Faines*, 297 AD2d 590, 593 [2002], *lv denied* 99 NY2d 558 [2002]; *Heston*, 152 AD2d at 1000; *and see Immigration & Naturalization Serv. v Delgado*, 466 US 210, 216 [1984] ["interrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure"]). As we stated in *Faines*, "two requirements of a lawful level I inquiry" emerge from the case law:

> "First, [the inquiry] may not involve 'pointed questions,' which transform an encounter from one with a merely business-like tint to one with an intimidating or accusatory tone. Second, level I inquiries, when viewed in the aggregate, may not create a reasonable belief that the approached person is an investigatory target." (297 AD2d at 593.)

The requirements of a "lawful level I inquiry" recognized in *Faines* were plainly satisfied by Officer Bombolino's request to see defendant's driver's license upon finding him at the wheel of a car blocking a fire hydrant. In making the request, the officer did not pose "pointed" or "accusatory" questions, nor did he do anything (such as ordering defendant to get out of the car, to remain in the car, or to refrain from moving the car) that would have given defendant reason to believe that he was an investigatory target (*cf. Harrison*, 57 NY2d at 475-477 [police effected level III stop, requiring reasonable suspicion of criminality for justification, by ordering occupants of parked car to remain inside the vehicle]). Further, a request for a driver's license cannot be deemed to encroach heavily on a motorist's privacy interests, given that such requests are a common, if unwelcome, part of the driving experience (*see* Vehicle and Traf-

fic Law § 401 [4] [a motorist is obligated to produce for inspection, upon a police officer's request, "all information required concerning his license to operate" the vehicle]). We note that even Justice Ellerin does not claim that the request for defendant's driver's license was any more than a level I inquiry.

In fact, it is well established by prior case law that a police officer, in directing a level I request for information to an occupant of an already-stationary vehicle, is entitled to ask such a person—whether the driver or a passenger—for documentary identification, such as a driver's license. In *Ocasio*, while the car in which the defendant (the driver) and his passenger were traveling was stopped at a red light, police officers approached each side of the vehicle and "tapped on the window, *asking for identification*" (85 NY2d at 984 [emphasis added]; *see also People v Ocasio*, 201 AD2d 15, 17 [1994], *affd* 85 NY2d 982 [1995] [the Appellate Division decision in the same case notes that the officer "asked, '(h)ow you doing, can I *see* your identification?' " and, when asked what was wrong, he "replied, 'Nothing. I want to *see* your identification' " (emphasis added)]). In response to the request, the defendant's passenger handed up a wallet containing another man's driver's license and credit cards, which led directly to the arrest of both the defendant and the passenger on robbery charges (*id.*). The Court of Appeals held that this "[i]nitial questioning, limited to a request for identification, was consistent with a request for information, which involves basic, nonthreatening questions regarding, for instance, identity, address or destination" (85 NY2d at 985, citing *Hollman,* 79 NY2d at 185, 191). *Ocasio* demonstrates the principle that, where an officer has justification for making a level I inquiry to the occupant of an automobile, a request for a driver's license or other documentary identification is a valid part of that inquiry. Further, nothing in *Ocasio* suggests that an officer, once he or she has an "objective, credible reason" to direct a level I inquiry to the occupant of a stopped vehicle, requires further specific justification for requesting documentary identification.

Another case illustrative of a police officer's right, on a level I request for information, to ask to see the driver's license of a person in a stopped vehicle, is the Fourth Department's decision in *Heston*, which predates *Ocasio* by about six years. The *Heston* court held that a police officer properly "approach[ed] . . . an occupied parked car for inquiry," which inquiry included a request to see the driver's license of the person at the wheel,

based on merely "an objective credible reason to do so, irrespective of whether the officer ha[d] any indication of criminal activity" (152 AD2d at 999-1000). As with *Ocasio*, the primary significance of *Heston* for the instant case is its recognition of the kind of requests a police officer is permitted to make on a level I inquiry to a person in a stopped car. We do find it significant, however, that the observations that justified the police approach in *Heston* did not include any circumstances that necessarily indicated criminal activity.

Justice Ellerin, although not citing any decision directly on point, asserts that we are compelled to affirm the order granting defendant's suppression motion, and dismissing his indictment, because, at the time Officer Bombolino made his approach, "he did not observe any traffic violation," nor did he "have reason to suspect that defendant's driver's license had been suspended." As Justice Ellerin reasons, since Officer Bombolino had no grounds to suspect that defendant lacked a valid driver's license, it follows that the officer, notwithstanding his right to ask defendant to move his car, had no right to begin the encounter by asking to see defendant's driver's license. Indeed, in Justice Ellerin's view (as in Justice Tom's), the officer was not entitled even to ask defendant to identify himself. According to Justice Ellerin, our holding to the contrary (in the words of a prior decision of this Court) "sanction[s] the erosion of [the] fundamental constitutional guarantees . . . [that] shield innocent individuals from the arbitrary assertion of the State's formidable power" (*People v Elam*, 179 AD2d 229, 234 [1992], *appeal dismissed* 80 NY2d 958 [1992]). Needless to say, we disagree. Allowing a police officer to ask a motorist parked at a fire hydrant to show a driver's license does not erode "fundamental constitutional guarantees."

Justice Ellerin's analysis is predicated on her characterization of the case law as requiring that even a level I inquiry be justified by "an articulable suspicion based on knowledge or observation." Plainly, by "an articulable suspicion," Justice Ellerin means "an articulable suspicion" that the person in question is involved in some illegality. In the case of a car parked at a fire hydrant, according to Justice Ellerin, the prerequisite to a level I inquiry is the officer's "objectively credible belief" that "the person [at the wheel] may not be licensed to drive." This view, which essentially conflates the grounds for the first three levels of police-civilian encounters (*see Hollman*, 79 NY2d at 184-185) into one higher standard of reasonable suspicion, is erroneous.

In order to adhere to this view, Justice Ellerin avoids quoting the Court of Appeals' repeated statement that a level I inquiry may be justified by circumstances that are "not necessarily indicative of criminality" (see *People v McIntosh*, 96 NY2d 521, 525 [2001]; *Ocasio*, 85 NY2d at 985; *Hollman*, 79 NY2d at 184, 185; *De Bour*, 40 NY2d at 223; see also id. at 213 [the basis for a level I inquiry "need not rest on any indication of criminal activity"]).

Thus, contrary to Justice Ellerin's assertion that our holding "is in direct conflict with prior holdings of the Court of Appeals," the fact is that no authority requires the result the dissenters would reach, nor does any authority mandate the path that either Justice Tom or Justice Ellerin takes to that result.[9] Accordingly, even if the question before us is regarded as an open one, this case calls for the exercise of judgment in striking a reasonable balance between the values of individual liberty and public safety in the particular circumstances presented (see *Wheeler*, 2 NY3d at 374). In our view, when one balances all of the relevant factors—the attenuation of defendant's privacy interest by reason of his choice to stop his car beside a fire hydrant; the slight degree to which the police action intruded on that already attenuated privacy interest; and the significant governmental interest in public safety and law enforcement that the police action sought to advance—the conclusion is that the circumstances presented by this case constitute one of the "countless situations where there is an objective, credible reason to question a person" (*McIntosh*, 96 NY2d at 527). In sum, under the circumstances, the officer had an objective, credible reason for asking to see defendant's driver's license; that request did not constitute a forcible stop; and, therefore, the request was lawful.

Accordingly, the order of the Supreme Court, New York County (William A. Wetzel, J.), entered on or about September 17, 2001, which granted defendant's motion to suppress certain physical evidence, should be reversed, on the law and the facts, the motion denied, the indictment reinstated, and the matter remanded for further proceedings.

Toм, J.P. (dissenting). Because the detention of a motorist for

---

**9.** While each dissenter claims to be in agreement with the other approach, it is curious that the dissenters find it necessary to propound different theories for finding the rather ordinary police conduct in this case to have been unlawful.

the purpose of inspecting documentation involves a level III encroachment on individual freedom under *People v De Bour* (40 NY2d 210, 223 [1976]) and it is undisputed that the police lacked any reason to suspect criminality, I respectfully dissent and would affirm the suppression order.

There is no dispute concerning the material facts. Defendant's vehicle was standing at a fire hydrant on the south side of 142nd Street, a one-way street for eastbound traffic. The engine was running and defendant was seated behind the steering wheel as the arresting officers approached in a marked police van. After positioning the van "directly in front of" defendant's car, a uniformed officer immediately approached "the driver's side of the vehicle and asked the defendant for his license."

The majority appears to reason that because the police did not physically stop defendant's car, it is unnecessary to justify the restraint imposed upon his freedom of movement. The operative concept, however, is not whether the vehicle was subjected to a traffic stop but whether defendant was detained.

As the United States Supreme Court warned in *Terry v Ohio* (392 US 1, 17 [1968]):

> "The danger in the logic which proceeds upon distinctions between a 'stop' and an 'arrest,' or 'seizure' of the person, and between a 'frisk' and a 'search' is twofold. It seeks to isolate from constitutional scrutiny the initial stages of the contact between the policeman and the citizen. And by suggesting a rigid all-or-nothing model of justification and regulation under the Amendment, it obscures the utility of limitations upon the scope, as well as the initiation, of police action as a means of constitutional regulation."

In this case, this Court's attention is squarely directed to the scope and initiation of police action towards defendant and the intrusion upon his right to be " 'free from all restraint or interference of others, unless by clear and unquestionable authority of law' " (*Terry v Ohio*, 392 US at 9, quoting *Union Pacific R. Co. v Botsford*, 141 US 250, 251 [1891]).

In New York, *People v Ingle* (36 NY2d 413, 418 [1975]) established that a driver whose vehicle is " 'restrained' by a police officer while a document or equipment check is conducted" is subjected to a seizure within the meaning of *Terry v Ohio* (392 US at 16) and, when the seizure is without justification, any derivative evidence obtained is required to be suppressed

(*Ingle*, 36 NY2d at 418-419). Although Vehicle and Traffic Law § 401 (4) requires a driver to produce his license upon request by a police officer, the officer must have a sufficient basis to demand its production; interference with the free movement of a vehicle is not permitted "unless the police officer reasonably suspects a violation of the Vehicle and Traffic Law" (*Ingle* at 419). Under *De Bour*'s four-tiered analysis, reasonable suspicion that an infraction is being committed by a particular person is the predicate for a "forcible stop and detention" (*De Bour*, 40 NY2d at 223), a level III, not a level I, intrusion upon the "individual's liberty of movement" and the "right to be free from aggressive governmental interference" (*id.* at 216; *see People v May*, 81 NY2d 725, 727 [1992] ["the stop was proper only if the officers had a reasonable suspicion of criminal activity"]).

It is conceded that defendant was in full compliance with New York City parking regulations[1] by positioning his vehicle at a fire hydrant with the engine running, while he remained at the wheel. It is also uncontested that the arresting officers parked their van "directly in front of" defendant's car, blocking its movement, and that the officers immediately approached defendant and demanded his driver's license. Pursuant to Vehicle and Traffic Law § 401 (4), defendant was legally compelled to comply.

While the majority suggests that the arresting officer's intent was to tell defendant to move his car and that positioning the police van so as to prevent movement of defendant's vehicle was merely inadvertent, the testimony indicates otherwise. The court asked the officer about his approach.

> "THE COURT: What was your reason for approaching the vehicle?

---

1. 34 RCNY 4-08 (e) (2) provides that it is unlawful to stop, stand or park: "Within fifteen feet of a fire hydrant, unless otherwise indicated by signs, or parking meters, except that during the period from sunrise to sunset if standing is not otherwise prohibited, the operator of a passenger car may stand the vehicle alongside a fire hydrant provided that the operator remains in the operator's seat ready for immediate operation of the vehicle at all times and starts the motor of the car on hearing the approach of a fire apparatus, and provided further, that the operator shall immediately remove the car from alongside the fire hydrant when instructed to do so by any member of the police, fire, or other municipal department acting in his/her official capacity."

"THE WITNESS: Because the defendant was blocking the fire hydrant.

"THE COURT: Did you ask him to move?

"THE WITNESS: No."

Asked on cross-examination about the positioning of the police van the officer was driving, the following colloquy ensued:

"Q. And you parked his car in front of your car [sic] so it could no longer move; is that fair to say?

"A. Yes. I made a U-turn and then came around directly in front of the defendant.

"THE COURT: You blocked him?

"THE WITNESS: Yes."

The test of whether an encounter with police has progressed beyond a mere request for information to a seizure was set forth in *United States v Mendenhall* (446 US 544, 554 [1980]), which states that "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." The test is same in New York. As the Court of Appeals stated in *People v Cantor* (36 NY2d 106, 111 [1975]), "Whenever an individual is physically or constructively detained by virtue of a significant interruption of his liberty of movement as a result of police action, that individual has been seized within the meaning of the Fourth Amendment [*Terry v Ohio*, 392 US at 19]. This is true whether a person submits to the authority of the badge or whether he succumbs to force."

The Court stated, "The minimum requirement for a lawful detentive stop is a founded suspicion that criminal activity is afoot" (*Cantor*, 36 NY2d at 114). This is a level II encounter within the four-tiered *De Bour* analysis, involving "a somewhat greater intrusion [than a request for information] in that a policeman is entitled to interfere with a citizen to the extent necessary to gain explanatory information, but short of a forcible seizure" (*People v De Bour*, 40 NY2d at 223).[2]

---

**2.** The People do not assert that the police officers in this case were exercising the common-law right to inquire, which requires "a founded suspicion

As the United States Supreme Court explained in *Florida v Royer* (460 US 491, 498 [1983]):

> "Prior to *Terry* v. *Ohio, supra,* any restraint on the person amounting to a seizure for the purposes of the Fourth Amendment was invalid unless justified by probable cause. *Dunaway* v. *New York,* [442 US 200, 207-209 (1979)]. *Terry* created a limited exception to this general rule: certain seizures are justifiable under the Fourth Amendment if there is articulable suspicion that a person has committed or is about to commit a crime."

Whether defendant was seized within the contemplation of *Terry v Ohio* depends on whether a reasonable person in his circumstances would have believed he was free to leave (*Mendenhall,* 446 US at 554). An individual who is approached by police without the minimal "founded suspicion that criminal activity is afoot" (*Cantor,* 36 NY2d at 114) *"may not be detained even momentarily without reasonable, objective grounds for doing so"* (*Royer* at 498 [emphasis added]).

In the matter at bar, defendant's departure was rendered impossible by police action. Although the officers did not physically stop defendant's vehicle, which was already stationary at a fire hydrant, they immediately prevented its free movement by placing their van directly in front of defendant's car, concededly blocking it and thereby effecting a *Terry* stop (*see People v Sobotker,* 43 NY2d 559 [1978]; *People v Morrison,* 161 AD2d 608 [1990]; *People v Brown,* 112 AD2d 945, 946 [1985]). In addition, one officer approached the driver's side of the vehicle and directed defendant to produce his driver's license,[3] a demand to which defendant was legally obligated to submit. By taking up a position on the driver's side, in the roadway, the police officer

that criminal activity is afoot" (*De Bour,* 40 NY2d at 223; *see also May,* 81 NY2d at 728).

3. Although the majority accords no significance to the demand for defendant's driver's license, retention of a license has been held to be the very definition of the *Terry* stop: "if the officer retains the driver's license, he or she must have reasonable and articulable suspicion to question the driver about drugs or weapons" (*United States v Turner,* 928 F2d 956, 959 [10th Cir 1991], *cert denied* 502 US 881 [1991]) and "an officer must return a driver's documentation before the detention can end" (*United States v Mendez,* 118 F3d 1426, 1430 [10th Cir 1997]). In discussing police conduct in *Royer* (460 US at 501), the Supreme Court observed that by retaining the suspect's driver's license and airline ticket and asking him to accompany them "without indicating in any way that he was free to depart, Royer was effectively seized for the purposes of the Fourth Amendment."

further prohibited the movement of defendant's vehicle. Thus, by the methods employed in their encounter with defendant, the police were clearly "indicating that compliance with the officer's request might be compelled" (*Mendenhall,* 446 US at 554) so as to effect the seizure of his person. Suppression of the evidence recovered is required because defendant was prevented from leaving the scene and constrained to respond to questioning without the prerequisite showing of reasonable suspicion that he was engaged in conduct involving criminality (*People v Ingle,* 36 NY2d at 418-419).

*People v Ocasio* (85 NY2d 982 [1995]), relied upon by the majority, is readily distinguishable. In *Ocasio,* the "[d]efendant's progress was halted by a stoplight, not the police" (*id.* at 984; *see also People v Valentin,* 174 AD2d 353 [1991], *lv denied* 79 NY2d 833 [1991]). The Court stated, "Determination whether a seizure occurred here—where the car was neither parked nor moving—requires the fact finder to apply a settled standard: whether a reasonable person would have believed, under the circumstances, that the officer's conduct was a significant limitation on his or her freedom" (*Ocasio,* 85 NY2d at 984). The Court was careful to note that the police asked only for identification and that "[n]o sirens or lights were used to interfere with defendant's transit . . . and defendant was at no time prevented from departing" (*id.*). By contrast, defendant herein was prevented from leaving the scene physically (because egress was blocked) and legally (because he was compelled to exhibit a driver's license to the police officers). These circumstances constitute a detention because defendant could not reasonably " 'disregard the police and go about his business' " (*Florida v Bostick,* 501 US 429, 434 [1991], quoting *California v Hodari D.,* 499 US 621, 628 [1991]).

*People v Gonzalez* (115 AD2d 73 [1986], *affd* 68 NY2d 950 [1986]) is similarly distinguishable on its facts. There, police officers, in accordance with the traffic regulation, merely asked the driver to move her vehicle away from the hydrant. Only *after* she responded that she did not have a driver's license and that the car was not hers did the officers block her path with their patrol car (*id.* at 75).

*Gonzalez* is further distinguishable on its analysis. At issue was the legal predicate for a search conducted in connection with a presumably valid traffic stop (*see e.g. People v Turriago,* 219 AD2d 383, 387 [1996], *mod* 90 NY2d 77 [1997]). The propriety of the detention of the defendant's vehicle was not

before the Court because the defendant had conceded the point. As the opinion states, "the vehicle was stopped or standing at a fire hydrant, *concededly* a traffic infraction" (*Gonzalez,* 115 AD2d at 82 [emphasis added]). From that perspective, this Court's statement that the police officers were justified in approaching the subject vehicle "to request information" (*id.*) is altogether correct insofar as it concerns the officers' initial approach to request that the driver move her car away from the hydrant.[4] We concluded, "While the circumstances justified the initial stop and the inquiry, there was nothing to render permissible any greater level of intrusion" (*id.*). Therefore, we upheld the suppression of contraband found as the result of the search of a bag found in the vehicle (*id.* at 83-84), and the Court of Appeals affirmed, noting that there was neither "consent to nor an adequate constitutional predicate for the seizure and search of the bag" (*Gonzalez,* 68 NY2d at 951).

A case more to the point is *People v Harrison* (57 NY2d 470 [1982]), in which the police approached a parked car and prevented the occupants from leaving. The Court stated, "Confining the occupants to the car, even temporarily, is at least equivalent to a stop" (*id.* at 476). Thus, reasonable suspicion was required to justify the limited seizure (*id.*).

Also pertinent is *People v May* (81 NY2d 725 [1992], *supra*), in which the defendant's vehicle, initially parked at the curb, slowly pulled away after police parked behind it. The Court noted that the police officers had observed the defendant "in a car parked on a desolate street, a fact which provided them with no information regarding criminal activity" and that the defendant's action in pulling away "could not serve to create a reasonable suspicion of criminality" (*id.* at 728). The Court emphasized that the police "may . . . make a common-law inquiry of those in a vehicle based upon a founded suspicion" but "may not forcibly detain civilians in order to question them . . . without a reasonable suspicion of criminal activity and once defendant indicated, by pulling away from the curb, that he did not wish to speak with the officers, they should not have forced him to stop without legal grounds to do so" (*id.*; *see also People v Spencer,* 84 NY2d 749, 752 [1995], *cert denied* 516 US 905 [1995]).

The circumstances of defendant's encounter with police do not support the majority's position that the arresting officer

---

4. Significantly, *Gonzalez* contains no discussion of the applicable traffic regulation.

merely made a request for information. This Court has recognized that for a police confrontation with a civilian to be considered a "minimal intrusion of approaching to request information" (*De Bour*, 40 NY2d at 223), the civilian must retain the right to refuse to cooperate and simply walk away (*see People v Flynn*, 15 AD3d 177 [2005]; *People v Mitchell*, 185 AD2d 163, 165 [1992], *appeal dismissed* 81 NY2d 819 [1993]; *People v Castro*, 129 AD2d 406, 410 [1987] [Rosenberger, J., dissenting on other grounds], *affd* 70 NY2d 943 [1988]). As the Court of Appeals stated in *People v Howard* (50 NY2d 583, 586 [1980], *cert denied* 449 US 1023 [1980]), "An individual to whom a police officer addresses a question has a constitutional right not to respond. He may remain silent or walk or run away." The Court noted that "seizure" has been defined "by whether the individual interrogated had lost his 'equal right to ignore his interrogator and walk away'" (*id.* at 591, quoting *Terry v Ohio*, 392 US at 33 [Harlan, J., concurring]).

It is immaterial that defendant did not actually have a license. In the absence of any reasonable basis to believe that criminality was afoot, defendant's detention was unlawful. A police officer's mere hunch is not a sufficient basis for an intrusion upon an individual's freedom of movement, even where official intrusion does not rise to the level of a seizure (*Ocasio*, 85 NY2d at 985). The majority's resort to post hoc reasoning is a transparent attempt to justify the means by the end (*see Turriago*, 219 AD2d at 394).

Finally, I agree with Justice Ellerin that the arresting officer lacked any objective credible reason to request information from defendant, a prerequisite restated in *Ocasio* (at 985): "In the case of a car that has been approached but not seized, as we recently noted in *People v Spencer* (84 NY2d 749), the police must possess an articulable basis for requesting information." Nothing in defendant's behavior or the position of his vehicle was remotely suspicious, and the arresting officer articulated no reason for interfering with defendant by approaching him to request information (*id.*). That the car was legally stopped at a fire hydrant does not amount to an "objective credible reason for that interference" (*De Bour*, 40 NY2d at 223).

The dispositive fact in this matter is that defendant was deprived of the right to simply refuse to cooperate with the police and depart from the scene without responding to their questions. "The crucial factor was that depriving defendant of his freedom of movement was effected by the police" (*Cantor*, 36

NY2d at 112). Having subjected defendant to a *Terry* stop without the necessary predicate of reasonable suspicion of criminal activity required by *People v De Bour* (40 NY2d at 223), the police illegally detained him and, thus, the evidence obtained as a result of the detention must be suppressed (*Ingle*, 36 NY2d at 418-419).

Accordingly, the order granting suppression and dismissing the indictment should be affirmed.

ELLERIN, J. (dissenting). I would affirm the suppression court's holding that the police officer's request to see defendant's license was not permitted under these circumstances and therefore warranted suppression of the evidence.

While the fact pattern of this case might lend itself to Justice Tom's interpretation of a level III encounter under *People v De Bour* (40 NY2d 210 [1976]), in my view, more significantly, it does not justify even a level I request for information.

A New York City traffic rule, which makes it otherwise unlawful to park within 15 feet of a fire hydrant, expressly provides that

> "during the period from sunrise to sunset if standing is not otherwise prohibited, the operator of a passenger car may stand the vehicle alongside a fire hydrant provided that the operator remains in the operator's seat ready for immediate operation of the vehicle at all times and starts the motor of the car on hearing the approach of fire apparatus, and provided further, that the operator shall immediately remove the car from alongside the fire hydrant when instructed to do so by any member of the police, fire, or other municipal department acting in his/her official capacity" (34 RCNY 4-08 [e] [2]).

In the instant case, a police officer observed a man in the driver's seat of a car parked near a fire hydrant. According to his testimony at the suppression hearing, Officer Bombolino intended to instruct defendant to move away from the hydrant, as the above traffic rule provides. But, after blocking the vehicle, the officer's first act upon approaching defendant's car was to ask to see defendant's driver's license. While the majority suggests that requests for driver's licenses are so common that motorists do not view them as undue encroachments on their privacy interests, most motorists would wonder what traffic infraction they had committed to warrant being asked to pro-

duce their driver's license. Most motorists assume that a request for a license is the consequence of a traffic infraction because they know that in the United States there are laws meant to protect individuals against arbitrary police conduct.

The majority's reliance on Vehicle and Traffic Law § 401 (4) in this regard is misplaced. Vehicle and Traffic Law § 401 (4) does not address the circumstances in which a police officer is permitted to request a license. It does not authorize a police officer, in enforcing the Vehicle and Traffic Law, to disregard state common law that addresses those circumstances—state common law that, as demonstrated below, the majority has distorted beyond all recognition. As this Court has warned, a court that "in its zeal to see the guilty punished" validates an inadequately grounded police search by what it produces "will end up by sanctioning the erosion of fundamental constitutional guarantees, the predominant and absolutely essential purpose of which is to shield innocent individuals from the arbitrary assertion of the State's formidable power" (*People v Elam*, 179 AD2d 229, 234 [1992, Murphy, P.J.], *appeal dismissed* 80 NY2d 958 [1992]).

The propriety of police-civilian encounters in this state is assessed according to the guidelines set forth by the Court of Appeals nearly 30 years ago in *People v De Bour* (40 NY2d 210 [1976]), a decision that "reflected [the Court's] judgment that encounters that fall short of Fourth Amendment seizures still implicate the privacy interests of all citizens and that the spirit underlying those words required the adoption of a State common-law method to protect the individual from arbitrary or intimidating police conduct" (*People v Hollman*, 79 NY2d 181, 195 [1992]). To that end, *De Bour* requires that police action be justified by a sufficient factual predicate at every stage of a police-civilian encounter, including level I, the preliminary informational stage, even when the action falls below the level of a seizure.

At the preliminary informational stage, that predicate is "some articulable reason" for the request (40 NY2d at 213), something "sufficient to arouse the officers' interest" (at 220). The propriety of even a request for identification depends upon the police officer's acting "with the requisite level of suspicion" (*Hollman*, 79 NY2d 181, 190 [1992], citing *De Bour, supra*). "In determining the legality of an encounter under *De Bour* and *Hollman*, it has been crucial whether a nexus to conduct existed, that is, whether the police were aware of or observed conduct which provided a particularized reason to request information"

(*People v McIntosh*, 96 NY2d 521, 526-527 [2001]). Thus, it is the law in this state that a police officer may not intrude upon the privacy of a citizen, even at the preliminary informational stage of an encounter, without an articulable suspicion based on knowledge or observation.

When Officer Bombolino observed defendant at the wheel of a car standing alongside a hydrant, he did not observe any traffic violation. Indeed, the relevant traffic rule expressly provides that, unless otherwise prohibited, "the operator of a passenger car *may stand the vehicle alongside a fire hydrant provided that the operator remains in the operator's seat ready for immediate operation of the vehicle at all times*" (emphasis added). Nor did the officer have reason to suspect that defendant's driver's license had been suspended. Therefore, he was not justified in asking to see defendant's license (*De Bour, supra; see also People v Williams*, 79 AD2d 147, 150 [1981] [a license and registration check "is permissible only when an officer reasonably suspects that a violation of the Vehicle and Traffic Law has occurred or when it is conducted pursuant to nonarbitrary, nondiscriminatory, uniform procedures for detecting violations"]).

Nevertheless, the majority holds today that *De Bour* permits a police officer to approach a car parked near a hydrant and immediately ask to see the driver's license of the individual seated at the wheel, even though no factual predicate exists to justify the request. Notwithstanding the directive of the traffic rule, the majority purports to find support for the proposition that a car's presence beside a hydrant, without more, constitutes the requisite "objective credible reason" for a level I inquiry (*De Bour*, 40 NY2d at 223) in *People v Gonzalez* (115 AD2d 73 [1986], *affd* 68 NY2d 950 [1986]). But in *Gonzalez*, where the person in the driver's seat, after being requested to move the vehicle, indicated an inability to do so, the issue of whether there was a traffic infraction was not controverted. Significantly, in the instant case, all concede that there was no traffic infraction. "Of course," the majority says, "we do not suggest that a level I inquiry is warranted by the observation of any activity that, while apparently innocent on the surface, might theoretically involve illegality." Instead, the majority announces that this is a "special circumstance" that "create[s]" an objective credible reason justifying the officer's request for information. A car's blocking a hydrant is exceptional in that, "for obvious reasons of public safety, stopping one's car beside a hydrant invites the attention of law enforcement," and inviting police

attention so "attenuates [one's] privacy interest" as to justify a level I intrusion.

Apart from whether a holding of this Court that is in direct conflict with prior holdings of the Court of Appeals is good law, the reasoning by which the majority arrives at this holding is flawed. To the extent that a person who stops his or her car beside a hydrant may be asked by a police officer to move the car away from the hydrant, that person may be said to be "inviting police attention." But "inviting" an instruction to move one's car away from a hydrant is a far cry from asking to be detained for a perusal of one's driver's license. Moreover, the traffic rule that expressly permits a person to stop a car beside a hydrant does not provide for the person to be subject to a higher level of police attention than an instruction to move the car. As the majority itself recognizes, police attention to a person parked near a hydrant is motivated by public safety concerns. Equally, it must be limited by public safety concerns.* "[C]onstitutional rights to privacy and freedom from unreasonable searches and seizures must [not] be abandoned to accommodate the public service aspect of the police function" (*De Bour*, 40 NY2d at 218). While the officer may instruct the person to move the car away from the hydrant, in accordance with the traffic rule, he or she may not intrude on the person's privacy, even to the minimal extent of approaching to request information, absent an "objectively credible belief" that the person may not be licensed to drive (*id.* at 223). Unless the officer is "aware of or observed conduct which provided a particularized reason to request information" (*McIntosh, supra* at 527), the officer is not permitted to ask for the person's driver's license.

The majority contends that it is a matter of common sense that "a police officer, before directing a person to operate a car not already in motion, should ascertain that the person in the car holds a driver's license." This, of course, engrafts a requirement not included in the traffic rule itself. In support of this contention, the majority cites *Persaud v City of New York* (267 AD2d 220 [1999]). *Persaud* stands for the proposition that in directing a person sitting in the *passenger* seat to move a car,

---

* In this regard, the majority's contention that Officer Bombolino was justified in making a level I inquiry in the performance of his public service function is nothing short of baffling. The cited decisions—*Hollman*, in which the Court of Appeals stated unequivocally that "[the] public service approach for information is not the focus of *De Bour*" (79 NY2d at 189), and *Matter of Antoine W.* (79 NY2d 888 [1992]), which does not address the public service role of the police—simply do not support this contention.

without inquiring as to whether the person is licensed to drive, a police officer may be acting negligently, for which the officer and the city may be liable (at 221). It does not address the situation in which there is a person *at the wheel* of the car the officer wants moved. It holds only that failing to inquire as to whether the person in the passenger seat is licensed before directing that the car be moved may constitute negligence.

It is neither a matter of common sense nor reasonable that every time an officer intends to instruct an individual seated at the wheel of a car parked lawfully near a hydrant he should ascertain first that the individual holds a driver's license. In any event, it is pure speculation on the majority's part that Officer Bombolino was motivated by a sense of responsibility in deciding how to proceed in having the car moved. In fact, Bombolino testified that he approached the car intending to instruct defendant to move away from the hydrant; he did not provide any explanation whatsoever for why he instead immediately asked for defendant's license.

Contrary to the majority's contention, it is a matter of common sense, rooted in the determination to "safeguard the privacy and security of each and every person against all arbitrary intrusions by government" embodied in this State's common law (*Hollman*, 79 NY2d at 195, quoting *De Bour*, 40 NY2d at 217), that a police officer should presume that an individual seated at the wheel of a car parked alongside a hydrant, without more, holds a driver's license, until he has some articulable reason to suspect that the individual may not be properly licensed to drive the car. Absent such reason, as was here the case at the time Officer Bombolino initially approached defendant, the police officer may not, without more, demand the driver's license of a person seated at the wheel of a car stopped near a hydrant, because that demand is an arbitrary intrusion on the person's privacy, i.e., an intrusion that is not grounded in an objectively credible belief that the person should not be permitted to proceed on his way unimpeded. Here, the traffic rule provided the appropriate action for the officer, i.e., to instruct defendant to move the car away from the hydrant (34 RCNY 4-08 [e] [2]). The greater intrusion on defendant's liberty—the officer's request to see defendant's license—was not justified, and the fruits of the search that followed were properly suppressed.

SULLIVAN and NARDELLI, JJ., concur with FRIEDMAN, J.; TOM, J.P., and ELLERIN, J., dissent in separate opinions.

Order, Supreme Court, New York County, entered on or about September 17, 2001, reversed, on the law and the facts, defendant's motion to suppress certain physical evidence denied, the indictment reinstated, and the matter remanded for further proceedings.