People v Harris (2020 NY Slip Op 08079)





People v Harris


2020 NY Slip Op 08079


Decided on December 30, 2020


Appellate Division, Second Department


Miller, J., J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on December 30, 2020
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

RUTH C. BALKIN, J.P.
JEFFREY A. COHEN
ROBERT J. MILLER
BETSY BARROS, JJ.


2017-05563
 (Ind. No. 1243/16)

[*1]The People of the State of New York, respondent,
v
Shymeek Harris, appellant.



APPEAL by the defendant from a judgment of the Supreme Court, Queens County (Ronald D. Hollie, J.), rendered April 19, 2017, convicting him of criminal possession of a forged instrument in the second degree, upon his plea of guilty, and imposing sentence. The appeal brings up for review the denial, after a hearing, of those branches of the defendant's omnibus motion which were to suppress physical evidence and his statement to law enforcement officials. By decision and order of this Court dated September 25, 2019, the matter was remitted to the Supreme Court, Queens County, for a new determination of those branches of the defendant's omnibus motion which were to suppress physical evidence and his statement to law enforcement officials, and thereafter a report to this Court advising of the new determination. The appeal was held in abeyance pending receipt of the Supreme Court's report (see People v Harris, 175 AD3d 1555). The Supreme Court has now filed a report.



Paul Skip Laisure, New York, NY (Samuel Barr of counsel), for appellant.
Melinda Katz, District Attorney, Kew Gardens, NY (John M. Castellano, Johnnette Traill, Joseph N. Ferdenzi, and Roni C. Piplani of counsel), for respondent.



MILLER, J.


OPINION & ORDER
The defendant contends that the Supreme Court should have granted those branches of his omnibus motion which were to suppress physical evidence and his statement to law enforcement officials. The defendant maintains that, on this record, the court should have declined to credit the testimony of the People's witnesses at the suppression hearing. For the reasons more fully set forth below, we agree that the People failed to sustain their initial burden of demonstrating the legality of the police conduct in the first instance, and that, under the circumstances of this case, the court should have granted those branches of the defendant's omnibus motion which were to suppress physical evidence and his statement to law enforcement officials. Accordingly, we reverse.
I. Factual & Procedural Background
The defendant was a passenger in a vehicle that was stopped for alleged traffic infractions. The defendant and the driver of the vehicle were ultimately arrested. During the encounter, law enforcement officials recovered a single credit card (with an alleged burn mark on it) from the center console of the vehicle, and they recovered a stack of about 15 other credit cards from the defendant's person. The defendant was also alleged to have made an incriminating statement during the encounter.
The defendant was charged with seven counts of criminal possession of a forged instrument in the second degree and two counts of criminal possession of stolen property in the fourth degree. As relevant here, the first count alleged, under an acting-in-concert theory (cf. Penal [*2]Law § 265.15[3]), that the defendant possessed a credit card bearing a number ending in 1544—the allegedly burned card from the center console. The second count alleged that the defendant possessed a credit card bearing a number ending in 6043—one of the cards recovered from the defendant's person.
The defendant moved to suppress: (1) the credit card recovered from the center console of the vehicle, (2) the group of credit cards recovered from the defendant's person, and (3) the statement the defendant allegedly made to law enforcement officials during the encounter. The People opposed the defendant's motion to suppress the physical evidence and his statement to law enforcement officials.
The Supreme Court, Queens County (Stephanie Zaro, J.), granted the defendant's motion to suppress "to the extent that a Mapp/Huntley/Dunaway hearing [was] ordered." The suppression hearing took place before the Supreme Court, Queens County (Ronald D. Hollie, J.), over the course of five different days between October 3, 2016, and October 28, 2016.
At the hearing, the People presented the testimony of the two law enforcement officials who recovered the physical evidence and recorded the defendant's statement: Detective Dimitri Roidis, and Sergeant Ramrio Ruiz. After the People rested, the defendant called three witnesses to testify, including the individual who was operating the vehicle that was stopped by the police, Carlos Richards.
The Supreme Court, Queens County (Ronald D. Hollie, J.), denied the defendant's motion to suppress in a two-paragraph decision and order. The decision and order did not make any specific credibility determinations or factual findings, and did not state the legal basis for the denial of the defendant's suppression motion.
The defendant subsequently entered into a plea agreement and pleaded guilty to the second count in the indictment which charged him with criminal possession of a forged instrument in the second degree. The defendant was sentenced, in accordance with the plea agreement, to four years of probation.
On appeal, the defendant contends that the Supreme Court should have granted his motion to suppress. The People argue that the defendant failed to establish his standing to challenge the search of the vehicle (cf. People v Wesley, 73 NY2d 351, 360-361), and that, in any event, the police testimony at the suppression hearing was properly credited by the hearing court.
In a decision and order dated September 25, 2019, this Court remitted the matter "to the Supreme Court, Queens County, for a new determination of those branches of the defendant's omnibus motion which were to suppress physical evidence and his statement to law enforcement officials in accordance herewith, and thereafter a report to this Court advising of the new determination" (People v Harris, 175 AD3d 1555, 1555). The appeal was held in abeyance in the interim (see id.).
The Supreme Court, Queens County (Ronald D. Hollie, J.), subsequently issued a report which included findings of fact and conclusions of law in support of its determination denying the defendant's motion to suppress. After the Supreme Court's report was filed, both parties provided supplemental briefing to this Court.
II. Discussion
We disagree with the Supreme Court's determination to deny the defendant's suppression motion. For the reasons explained below, we conclude that none of the testimony of the People's witnesses should be credited, such that the People failed to prove the legality of the vehicle stop and the admissibility of the evidence obtained as a result. Accordingly, we reverse the judgment.
The Criminal Procedure Law provides that "[u]pon motion of a defendant who . . . is aggrieved by unlawful or improper acquisition of evidence and has reasonable cause to believe that such may be offered against him in a criminal action . . . a court may . . . order that such evidence be suppressed or excluded upon the ground that it . . . [c]onsists of tangible property obtained by means of an unlawful search and seizure under circumstances precluding admissibility thereof in a criminal action against such defendant" (CPL 710.20[1]).
If a court does not summarily grant or deny a motion to suppress (see CPL 710.60[2], [3]), "it must conduct a hearing and make findings of fact essential to the determination thereof" (CPL 710.60[4]). As relevant here, the purpose of a hearing pursuant to this section "is to determine whether suppression should be granted because of an unlawful search and seizure" (People v Moore, 185 AD2d 825, 825).
"[T]he CPL article 710 suppression procedure involves an adjudication based on mixed questions of law and fact" (People v Evans, 94 NY2d 499, 505; see People v Harrison, 57 NY2d 470; People v McRay, 51 NY2d 594). "The suppression court must make findings of fact, often requiring it to assess the credibility of witnesses" (People v Evans, 94 NY2d at 505). "It must then render its conclusions of law and the reasons for its determination, all of which must be set forth on the record (CPL 710.60[6]) as a basis for an order (CPL 710.70)" (id.; see People v Harris, 175 AD3d at 1557).
At the outset, as the People correctly observe, "[i]n general, a defendant seeking to suppress evidence, on the basis that it was obtained by means of an illegal search, must allege standing to challenge the search and, if the allegation is disputed, must establish standing" (People v Carter, 86 NY2d 721, 722-723). Of course, the Court of Appeals has made clear that the issue of standing must be preserved, and thus "the People are required to alert the suppression court if they believe that the defendant has failed to meet his [or her] burden to establish standing" (People v Hunter, 17 NY3d 725, 727-728).
Here, by setting forth their position that the defendant lacked standing to contest the search of the vehicle in their written opposition to the defendant's omnibus motion, the People adequately "made [their] position" on that issue "known to the court" (CPL 470.05[2]; cf. People v Sanchez, 226 AD2d 284, 284; People v Graham, 211 AD2d 55, 57-58). Indeed, the defendant actually addressed the issue of standing in his post-hearing memorandum. Accordingly, we review the issue of whether the defendant sustained his burden of demonstrating "standing to challenge the search" (People v Carter, 86 NY2d at 722-723).
The People contend that the evidence adduced at the suppression hearing demonstrated that the police witnesses lawfully stopped Richards' vehicle for committing certain traffic infractions. The People maintain that after the vehicle was lawfully stopped, the testimony of the police witnesses demonstrated that they were able to observe the burned credit card on the center console of Richards' vehicle, in plain view, and that, in light of their training and experience, they were "immediately" able to determine that "it was forged" based on their visual observations alone. The People further contend: "Because the burned credit card . . . was lawfully recovered under the plain view doctrine, and because it, alone, gave the police probable cause to arrest defendant, the stack of credit cards was lawfully recovered from defendant's person as a search incident to lawful arrest."
"[T]he stop of an automobile is a seizure implicating constitutional limitations" (People v Spencer, 84 NY2d 749, 752; see People v Hinshaw, 35 NY3d 427, 430; People v Wyatt, 153 AD3d 1371, 1372). Indeed, "[a] traffic stop constitutes a limited seizure of the person of each occupant" (People v Banks, 85 NY2d 558, 562). As this Court has previously recognized, "[a] passenger in a vehicle has a legitimate expectation that his or her travel will not be impeded by unlawful police conduct and therefore has standing to challenge the lawfulness of a stop of the vehicle in which he or she is riding" (People v Bell, 9 AD3d 492, 494; see People v May, 81 NY2d 725, 727; People v Millan, 69 NY2d 514, 520). Here, given the People's "version of the incident" (People v Leiva, 144 AD3d 599, 600), it was undisputed that the defendant was a passenger in the vehicle when it was stopped by the police. Accordingly, and as an initial matter, the defendant "as a passenger in the stopped vehicle, has standing to contest the stop of the vehicle and therefore to challenge any evidence seized as the fruit of the [allegedly] unlawful stop" (People v Nicodemus, 247 AD2d 833, 836; see People v Millan, 69 NY2d at 520; People v Fredericks, 234 AD2d 472, 473; People v Matthew, 228 AD2d 260, 260; People v Concepcion, 216 AD2d 141, 141; People v Dugard, 192 AD2d 418, 418; People v Dawson, 115 AD2d 611, 612; cf. People v Garcia, 39 AD3d 666, 667; People v Gonzalez, 25 AD3d 620, 621).
As relevant here, "where a police officer has probable cause to believe that the driver of an automobile has committed a traffic violation, a stop does not violate article I, § 12 of the New York State Constitution" (People v Robinson, 97 NY2d 341, 349; see People v Hinshaw, 35 NY3d at 430-431; People v Mundo, 99 NY2d 55, 58; People v John, 119 AD3d 709, 710). "In making that determination of probable cause, neither the primary motivation of the officer nor a determination of what a reasonable traffic officer would have done under the circumstances is relevant" (People v Robinson, 97 NY2d at 349).
"On a motion to suppress physical evidence, the People bear the burden of going forward to establish the legality of police conduct in the first instance" (People v Hernandez, 40 AD3d 777, 778; see People v Berrios, 28 NY2d 361, 367-368; People v Moses, 32 AD3d 866, 868). [*3]"Implicit in this concept is that the testimony offered by the People in first presenting their case must be credible" (People v Quinones, 61 AD2d 765, 766; see People v Berrios, 28 NY2d at 367-368; People v Fletcher, 130 AD3d 1063, 1064, affd 27 NY3d 1177). "Where the Judge at the suppression hearing determines that the testimony of the police officer is unworthy of belief, he [or she] should conclude that the People have not met their burden of coming forward with sufficient evidence and grant the motion to suppress" (People v Berrios, 28 NY2d at 369; see People v Hargrove, 162 AD3d 25, 61; People v Aguirre, 220 AD2d 438, 439; People v Keller, 185 AD2d 994; People v Burton, 130 AD2d 675, 676; People v Martinez, 71 AD2d 905). "[If] the People establish the legality of the police conduct by credible evidence, the defendant bears the burden of establishing that the arrest was not based on probable cause or that the police conduct was otherwise illegal" (People v Fletcher, 130 AD3d at 1064; see People v Spann, 82 AD3d 1013, 1014; People v Thomas, 291 AD2d 462, 463; cf. Matter of Robert D., 69 AD3d 714).
Here, in exercising our responsibility to conduct an independent factual review (see CPL 470.15[5]), which includes an assessment of witness credibility (see People v Romero, 7 NY3d 633, 643-644), we consider the full testimony of each of the witnesses, in the context of the entire record at the hearing (see generally Matter of Febles v Dutchess County Dept. of Social Servs. Child Protective Servs., 68 AD3d 993, 994; Matter of Brey v Board of Educ. of Jeffersonville-Youngsville Cent. School Dist., 245 AD2d 613, 615; Matter of Clay, 229 AD2d 50; People v Gentile, 127 AD2d 686, 687).
Sergeant Ramrio Ruiz testified that he has worked for the New York City Police Department for 11 years and has been the supervisor of a narcotics team for 2 years. On February 15, 2016, he was not on regular patrol; he was supervising a "buy-and-bust" unit. He was riding in a vehicle that was operated by Detective Dimitri Roidis. They had point-to-point contact with the six to eight other individuals on the buy-and-bust team.
Sergeant Ruiz testified that at approximately 4:45 p.m., he observed a black Pontiac make an illegal U-turn. Detective Roidis pulled over the Pontiac about four blocks later under elevated train tracks. It was daylight, cold, and cloudy.
After the vehicle was stopped, Sergeant Ruiz approached the passenger side where the defendant was sitting. The first thing Sergeant Ruiz did when he approached the car was to inquire about a credit card that he observed on the center console of the vehicle. The card appeared to have a "burn mark" on it which "could be used to press down the numbers, melt down the numbers on a card."
When he was asked whether he could see the number on the card from his vantage point outside of the vehicle, Sergeant Ruiz responded "[p]ossibly." At this point, the Supreme Court intervened and asked a series of questions. Upon questioning by the court, Sergeant Ruiz testified that he "could see the numbers and the name on the card" from outside the car.
Sergeant Ruiz specified that he could read the defendant's name on the card that lay on the center console from his vantage point outside of Richards' vehicle. He could also see that the fourth-to-last digit on the credit card number appeared to have been altered from a numeral "one" to a numeral "four."
Sergeant Ruiz testified that, based on his "training and experience" he believed that the card "could possibly be altered." He later clarified that he had never been involved in an arrest for a burned credit card. When he was asked what training he received, Sergeant Ruiz responded that he had not received instruction "in a class," but rather, "[i]t's from training from different scenarios of arrest from people altering cards."
Sergeant Ruiz testified that while he was standing next to the passenger side of the vehicle, he also noticed "a large amount of credit cards in [the defendant's] pocket." He estimated that there were about 15 or 20 cards in the defendant's left shirt pocket. When the Supreme Court interjected to ask whether the cards were in the defendant's shirt pocket or his jacket pocket, Sergeant Ruiz confirmed that they were in the defendant's "[s]hirt." Sergeant Ruiz did not remember if the defendant was wearing an outer garment when he observed the cards in the defendant's pocket.
Sergeant Ruiz stated that the stack of cards was in an open envelope which had been folded in half in the defendant's shirt pocket. The "top" part of the envelope was visible from where Sergeant Ruiz was standing and he could also see into the envelope from that vantage point. When he was asked to clarify how the cards were positioned in the envelope so that they could be seen from outside the vehicle, Sergeant Ruiz stated that all he could remember was that he could see the [*4]credit cards and he did not know if the envelope was sticking out of the defendant's pocket.
When Sergeant Ruiz saw the cards in the defendant's pocket, he asked the defendant "what are those[?]." Sergeant Ruiz testified that the defendant told him that "[he] found them." After he received this response, Sergeant Ruiz asked the defendant to exit the vehicle.
Sergeant Ruiz testified that after the defendant exited the vehicle, "at one point [he] did retrieve the cards from him." When asked how he retrieved the cards, Sergeant Ruiz responded: "I don't remember if he gave them to me or I took them out." After "retrieving" the cards, Sergeant Ruiz assisted in placing the defendant under arrest. He later stated that although he put someone in handcuffs, he could not recall whether it was the defendant or the driver.
Detective Roidis testified that he worked for the New York City Police Department for 12 years. On the date of the incident, he was working as an investigator for Queens Narcotics and Sergeant Ruiz was his supervisor.
Detective Roidis testified that on February 15, 2016, at approximately 4:40 p.m., he observed a black Pontiac fail to come to a complete stop. He decided to follow the vehicle. About five minutes later, he observed the vehicle make an illegal U-turn. Detective Roidis testified that he followed the vehicle for about four more blocks before finally pulling it over under elevated train tracks on Jamaica Avenue. The car was pulled over four or five blocks after the U-turn because that was a safe spot and there was inclement weather. Detective Roidis did not make a radio transmission regarding the stop. He did not recall if he made a U-turn while he was following the vehicle.
Detective Roidis testified that after he pulled over the vehicle and approached the driver's side window, he observed a credit card on the center console with a burn mark on it. Detective Roidis testified that he could see that the card had a small burn mark on it from where he stood outside the car.
At this point, Detective Roidis asked the driver to get out of the vehicle. The defendant, who was in the passenger seat, and the driver got out of the vehicle "[s]imultaneously." Detective Roidis testified that he asked the driver to get out of the vehicle because he "couldn't really hear that well" and because it was snowing and he was "getting hit with snow or flurries."
After the driver exited the vehicle, Detective Roidis took him to "the rear of the vehicle." Then Detective Roidis "went back to turn off the ignition of the car." Detective Roidis did not let the driver turn off the vehicle "[f]or safety reasons." As he was shutting off the ignition, Detective Roidis testified that he "was able to get a better look [at] the card." Detective Roidis "noticed that one of the numbers on the credit card was altered" such that the "original number" had been "replaced with a different number."
After he observed the altered number, Detective Roidis recovered the card from the console. There were also two other cards on the center console. After he recovered the burned card, Detective Roidis arrested both the defendant and the driver of the vehicle.
Detective Roidis testified that "additional credit cards [were] recovered from [the defendant's] person." Detective Roidis testified that those cards came from his jacket pocket, left-hand side. When asked how the cards were recovered from the defendant, Detective Roidis testified that he asked the defendant for identification and when the defendant retrieved his identification from his pocket, he also took out "a big bundle" of about 15 credit cards.
The People entered the credit card that was allegedly recovered from the center console into evidence as People's Exhibit 1. That card is a Bank of America Visa card bearing the defendant's name—"Shymeek Harris." In describing the card for the purposes of the indictment, the People identified it as bearing a number ending in "1544" not 4544 (emphasis added).
Carlos Richards, the driver of the black Pontiac, was called by the defendant to testify at the hearing. Richards testified that his "Chase Freedom" card was the only card in the center console of the car. He denied failing to come to a complete stop at a stop sign and did not recall making any U-turns, let alone an illegal one. When the officer first approached Richards, he asked him what he was doing in the area and if he had any drugs on him. The officer also asked him for his license and registration. When the officer returned back to the vehicle, he asked Richards to step out of the vehicle. Richards asked "why?" because he had not done anything wrong. The officer then opened the door and grabbed Richards. Richards got out of the vehicle because he did not want any "problems."
At the rear of the vehicle, Richards saw the police take credit cards out of the defendant's jacket. The cards were taken out of a zipped, horizontal pocket on the defendant's [*5]"bubble" jacket. Richards was also searched. "[A]fter that [they] were [placed] in handcuffs in the back of the [police] car."
Two paralegals who worked in the office of the Queens County District Attorney were also called to testify for the defendant. This testimony related to the preparation of a "crime report" for this case, which report made no mention of the "burn mark" on the credit card that was allegedly recovered from the center console. One of the paralegals testified that during the time that he was at the District Attorney's office, he worked on more than 25 to 30 credit card cases. None of those cases involved a burn mark as an indicator of forgery.
The defendant contends, among other things, that the People failed to sustain their initial burden of demonstrating the legality of the police conduct in the first instance. The defendant maintains that the Supreme Court should not have credited the testimony of the police witnesses as their accounts of the incident were incomplete, implausible, contradictory, and in conflict with other evidence in the record in numerous material respects.
"Credibility is a many faceted concept . . . requiring a careful assessment of a number of subtle factors before testimony can be labeled as believable or unbelievable" (People v Wise, 46 NY2d 321, 325; see Guide to NY Evid rule 6.11, Impeachment in General). "While it might be accurate to say that no one factor predominates, there are two fundamental considerations in evaluating whether a particular witness is speaking the truth: the honesty of the witness, and his [or her] ability to recall details" (People v Wise, 46 NY2d at 325; see CJI2d[NY] Credibility— Credibility of Witnesses; see also McCormick on Evidence § 49 [8th ed Jan. 2020 Update]).
"A hearing court's determination as to witness credibility is accorded great weight on appeal, as it saw and heard the witnesses" (People v Fletcher, 130 AD3d at 1064). "In reviewing a hearing court's factual determinations based largely upon an assessment of credibility, the determination of the trier of fact is ordinarily accorded great weight" (Matter of Robert D., 69 AD3d 714, 716-717; see People v Watson, 163 AD3d 855, 856-857; People v Lopez, 95 AD2d 241, 252). However, when the Appellate Division finds that the trier of fact incorrectly assessed the evidence, "the Appellate Division has the power to make new findings of fact" (People v Lopez, 95 AD2d at 253; see CPL 470.15; Matter of Robert D., 69 AD3d at 717; People v Garafolo, 44 AD2d 86, 88). "This fact-finding province is generally exercised in the context of an ample record made at a suppression hearing in which the issues were presented fully enough to allow review" (Matter of Robert D., 69 AD3d at 717; see People v Neely, 219 AD2d 444, 447).
While great weight must be accorded the credibility findings of the hearing court, this Court has also observed "that in assessing credibility 'we should not discard common sense and common knowledge'" (Matter of Carl W., 174 AD2d 678, 679, quoting People v Garafolo, 44 AD2d at 88; see People v Lewis, 195 AD2d 523, 523; People v Miret-Gonzalez, 159 AD2d 647, 649). "The rule is that testimony which is incredible and unbelievable, that is, impossible of belief because it is manifestly untrue, physically impossible, contrary to experience, or self-contradictory, is to be disregarded as being without evidentiary value, even though it is not contradicted by other testimony or evidence introduced in the case" (People v Maiwandi, 170 AD3d 750, 751 [internal quotation marks omitted]; see People v Lebron, 184 AD2d 784, 785; People v Garafolo, 44 AD2d at 88). Furthermore, this Court has long made clear that it "will not hesitate to refuse to credit testimony which has all appearances of having been patently tailored to nullify constitutional objections" (People v Lebron, 184 AD2d at 784 [internal quotation marks omitted]; see People v Maiwandi, 170 AD3d at 751-752; Matter of Bernice J., 248 AD2d 538, 539; People v Lewis, 195 AD2d at 523; Matter of Carl W., 174 AD2d at 679; People v Miret-Gonzalez, 159 AD2d at 649; People v Martinez, 71 AD2d at 905; People v Quinones, 61 AD2d at 766; People v Garafolo, 44 AD2d at 88). The application of the foregoing principles in the context of this Court's responsibility to conduct an independent factual review does not require a finding that testimony is incredible as a matter of law (see e.g. People v Maiwandi, 170 AD3d 750).
Here, although the Supreme Court credited both of the People's witnesses, their versions of the incident conflicted with each other and could not both be simultaneously true. "[C]redibility would be strained beyond the breaking point were we to accept" both of their accounts as true, as the Supreme Court did here (People v Quinones, 61 AD2d at 766). Indeed, as set forth above, the versions of the incident given by the People's witnesses differed in material respects at every stage of the investigation (see People v Martinez, 71 AD2d at 905; cf. People v Cuffie, 109 AD3d 1200, 1201-1202). For instance, Detective Roidis testified that he started following the car because he observed the driver fail to come to a complete stop, while Sergeant Ruiz, consistent with [*6]Richards' testimony, testified that he did not observe any such infraction. Although Sergeant Ruiz allegedly observed an illegal U-turn, Detective Roidis did not recall making a U-turn despite testifying that he was following the vehicle at the time. The testimony of the People's witnesses further diverged when they sought to explain the initial reasons for asking Richards and the defendant to exit the vehicle. The People's witnesses flatly contradicted each other when they each testified about the dubious circumstances under which the 15 cards were recovered from the defendant's pocket. In general, the "significant inconsistencies and gaps in memory" evinced by a comparison of the testimony of the People's witnesses bear negatively on their overall credibility (Citimortgage, Inc. v Feder, 186 AD3d 1315, 1315; see generally People v Marryshow, 162 AD3d 1313, 1317; cf. People v Markwick, 178 AD3d 1439, 1440).
Even viewed in isolation, the testimony given by each of the People's witnesses was, at times, "implausible and contrived" (People v Aguirre, 220 AD2d at 439). Most egregious was Sergeant Ruiz's testimony that he could read the numbers on the card on the center console and see a stack of cards inside an envelope inside the defendant's pocket, all while standing outside of Richards' vehicle. This testimony, on its face, was "so improbable as to be unworthy of belief" (id.; see People v Feingold, 106 AD2d 583, 584-585; People v Garafolo, 44 AD2d at 88).
Moreover, important aspects of the testimony of the People's witnesses, such as the so-called burn mark, were unsupported by contemporaneous police records (see People v Lebron, 184 AD2d at 785-786; cf. People v Gomez, 125 AD3d 426, 427). Other important aspects, like the testimony about the apparently altered digit on the allegedly burned card, were "contradicted by the remainder of the record" on appeal (Matter of Bernice J., 248 AD2d at 539; cf. People v Feingold, 106 AD2d at 584). In addition, although both of the People's witnesses repeatedly claimed certain training and experience in detecting credit card forgeries, their answers to questions about their qualifications were "vague or non-responsive and not credible" (Matter of McHale, 162 AD3d 117, 121 [internal quotation marks omitted]).
"Given the severely undermined credibility of the arresting officer[s], it is unclear exactly what happened during the encounter between the officer[s] and the defendant, and the hearing court was confronted with choices of possible scenarios" (People v Lebron, 184 AD2d at 787). Under similar circumstances, this Court has stated that, "where credibility is in issue, multiple choice questions are neither desirable nor acceptable," and the fact-finder should refuse to "select a credible version based upon guesswork" (id. [internal quotation marks omitted]).
III. Conclusion
In sum, under the circumstances, we decline to credit any of the testimony of the People's witnesses (see People v Maiwandi, 170 AD3d at 751-752; Matter of Robert D., 69 AD3d at 717; People v Lewis, 195 AD2d at 524; Matter of Carl W., 174 AD2d at 679; People v Miret-Gonzalez, 159 AD2d at 649; People v Quinones, 61 AD2d at 766; People v Parmiter, 55 AD2d 938; People v Manning, 51 AD2d 933, 933). Accordingly, "[u]pon scrutiny of the People's evidence at the suppression hearing, we can only conclude that they failed to carry their burden of going forward and demonstrating the legality of the police conduct in the first instance[,]" including the legality of the stop (People v Martinez, 71 AD2d 905; see People v Berrios, 28 NY2d at 367-368; People v Feingold, 106 AD2d at 585; see also People v Keller, 185 AD2d 994; People v Burton, 130 AD2d at 676). In view of this failure, "all further actions by the police as a direct result of the stop were illegal . . . [and] the evidence recovered as a result of the unlawful stop must be suppressed" (People v Allen, 89 AD3d 742, 744 [citation omitted]; see People v Rose, 67 AD3d 1447, 1449). Accordingly, "exercising our independent power of factual review, we conclude that the defendant's motion to suppress . . . should have been granted" (People v Maiwandi, 170 AD3d at 752). Without the suppressed evidence, there would not be legally sufficient evidence to prove the defendant's guilt. Accordingly, the indictment must be dismissed (see id.; People v Jones, 164 AD3d 1363, 1367; People v Graham, 134 AD3d 1047, 1048).
In light of the foregoing, we need not reach any of the parties' remaining contentions. Accordingly, the judgment is reversed, on the facts and in the exercise of discretion, those branches of the defendant's omnibus motion which were to suppress physical evidence and his statement to law enforcement officials are granted, the indictment is dismissed, and the matter is remitted to the Supreme Court, Queens County, for the purpose of entering an order in its discretion pursuant to CPL 160.50.
BALKIN, J.P., COHEN and BARROS, JJ., concur.
ORDERED that the judgment is reversed, on the facts and in the exercise of discretion, those branches of the defendant's omnibus motion which were to suppress physical evidence and his statement to law enforcement officials are granted, the indictment is dismissed, and the matter is remitted to the Supreme Court, Queens County, for the purpose of entering an order in its discretion pursuant to CPL 160.50.
ENTER:
Aprilanne Agostino
Clerk of the Court