People v Davis (2024 NY Slip Op 24041)

[*1]

People v Davis

2024 NY Slip Op 24041

Decided on February 15, 2024

Criminal Court Of The City Of New York, Queens County

Licitra, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the printed Official Reports.

Decided on February 15, 2024
Criminal Court of the City of New York, Queens County

The People of the State of New York

against
Davis, Defendant.

Docket No. CR-020772-22QN

For the People: Melinda Katz, District Attorney of Queens County (by William Weishaupt & Philip Amur)
For Mr. Davis: The Legal Aid Society (by Robert Flink)

Wanda L. Licitra, J.

On November 20, 2023, the court held a Mapp/Dunaway hearing. The following constitutes the court's findings of fact and conclusions of law.

 FINDINGS OF FACT
At the hearing, the People called one witness to testify, NYPD Officer Scott Edwards, shield number 14288. Having observed the witness's demeanor and appearance when answering each question, the court credits the following findings of fact.
Officer Edwards is a police officer at the 100th Precinct. He has worked for the NYPD for over nine years. Before his assignment at the 100th Precinct, he was a police officer at the 101st Precinct. There, he was a member of the "Neighborhood Safety Team." That, he explained, is a "proactive unit" that addresses "issues" in the area. Across his career, Officer Edwards has made about 125 arrests, including twenty-five arrests related to vehicle and traffic violations.
On August 19, 2022, Officer Edwards was working a shift in the Neighborhood Safety Team at the 101st Precinct in Queens. He was working with two partners, Officer Joseph Brand and Lieutenant Ryan Oshea. The officers were in uniform and traveling in an unmarked vehicle. Officer Edwards explained that the Neighborhood Safety Team is assigned unmarked vehicles.
At about 9:30 p.m. that evening, Officer Edwards observed a four-door vehicle with "excessively dark window tints" that was "parked by a fire hydrant." Its engine was running. The officers stopped their car, activated their emergency lights, and got out. They approached the four-door vehicle and immediately "command[ed]" the person inside to roll down the window. The person inside was the only occupant and he was seated in the driver's seat. That person was Mr. Davis.
Officer Edwards explained that the reason he "command[ed]" Mr. Davis to roll down the window is because "[i]n the normal course of a stop, you need to identify someone in order to, you know — to force some action." Mr. Davis refused to roll down the window. The officers then "command[ed]" him to open his door. Mr. Davis refused to do this, as well. After the officers gave more "commands" to Mr. Davis to roll down his window and open the door, Officer Edwards attempted to open the car doors himself. He first tried the front passenger-side door. It was locked. He then tried the rear passenger-side door. That was unlocked. He opened that door and, again, gave Mr. Davis more "commands." Mr. Davis refused them.
One of the officers managed to enter the vehicle—though it is unclear how—and unlocked another door. Officer Edwards and Officer Brand then forced Mr. Davis out. They did this because they intended to place him under arrest for "obstruction of governmental administration." The "governmental administration" that Officer Edwards believed that Mr. Davis "obstructed" was "refusing to comply with the stop, provide identification to us, roll down his window, and comply with the stop in any way."
After arresting Mr. Davis, the officers moved his vehicle back to the 101st Precinct, where they conducted an inventory search. Officer Edwards explained that he believes an inventory search is one conducted "to attempt to locate any valuables or contraband in the vehicle." Such contraband, he explained, includes weapons, drugs, and "things like that." The NYPD has written procedures for inventory searches, and they are published in the NYPD Patrol Guide. Officer Edwards has seen those procedures before, and the People introduced a copy of them as an exhibit. During the inventory search, the officers looked in the car, including the trunk, glove box, sides of the vehicle, and under the seats, "just trying to get — you know, find any contraband or valuable material," according to Officer Edwards.
In the glove box, Officer Edwards found a photocopy of an NYPD parking placard. Mr. Davis's name was written at the bottom. Officer Edwards said that other "items were recovered," but he did not specify who found other items or what they were. A different officer invoiced the placard as arrest evidence. To Officer Edwards, the photocopy was not a genuine placard. It was on printer paper, whereas a normal NYPD parking placard—which Officer Edwards personally owns—is on thicker, cardboard-like paper. Officer Edwards testified that the items recovered were "invoiced," which means that an itemized list of the property was created. However, Officer Edwards did not create this list. No such list was introduced into evidence. Nonetheless, Officer Edwards concluded that the process for the inventory search matched the procedure in the Patrol Guide.
No officer ever witnessed Mr. Davis attempting to use the photocopied placard.

 CONCLUSIONS OF LAW
At a Mapp/Dunaway hearing, the People have the initial burden of going forward to establish, prima facie, that each police action was lawful. (See, e.g., People v. Harris, 192 AD3d 151, 157-58 [2d Dep't 2020]). If the People meet their burden of production, the burden then shifts to the defense to show, by a preponderance of the evidence, that the police act was [*2]unlawful. (See, e.g., id.).
At the outset, the police lawfully approached Mr. Davis's vehicle. It is not illegal to park in front of a fire hydrant so long as a licensed driver remains at the wheel. (People v. Thomas, 19 AD3d 32, 33 [1st Dep't 2005]). Nonetheless, "a person who stops a car alongside a fire hydrant plainly invites, and should reasonably expect, an interaction with law enforcement." (Id.). Thus, a car blocking a hydrant provides an "objective, credible reason" for the officer to make "limited inquiries" of a person inside. (Id.).
Here, however, the police did more than that: they nearly immediately subjected Mr. Davis to a temporary detention. They activated their emergency lights before approaching the car; then, upon approaching, they issued various "commands." A reasonable person would believe these actions significantly limited their freedom, constituting a temporary seizure. (See, e.g., People v. Ocasio, 85 NY2d 982, 984 [1995] [courts should consider whether police activated their "lights" and gave "commands" when analyzing whether a seizure occurred]; People v. Spencer, 84 NY2d 749, 751 [1995] [turret lights and car horn sufficient to constitute seizure]; People v. May, 81 NY2d 725, 727 [1992] [turret lights, spotlight, and loudspeaker sufficient to constitute seizure]; People v. McBride, 79 Misc 3d 1238[A], at *4 [Sup. Ct., Nassau County 2023] ["The activation of emergency lights or sirens is a significant factor in determining whether an encounter rises to a [seizure]."]; People v. E.C., 77 Misc 3d 944, 956 [Just. Ct., Westchester County 2022] [turret lights and approach sufficient to constitute seizure]; see also People v. Velasquez, 64 Misc 3d 575, 581 [Crim. Ct., Bronx County 2019] [noting that "turret lights" are "characteristic of a police-dominated environment"]; cf. People v. Brown, 142 AD3d 1373, 1375 [4th Dep't 2016] [finding no seizure where the officer "never activated his vehicle's overhead lights or siren"]).
However, when officers observe a vehicle parked in front of a fire hydrant, that does not allow them to detain the people in the vehicle. An automobile stop is lawful only when based on "probable cause that a driver has committed a traffic violation"; on "reasonable suspicion that the driver or occupants have committed, are committing, or are about to commit a crime"; or on "nonarbitrary, nondiscriminatory, uniform highway traffic procedures." (People v. Hinshaw, 35 NY3d 427, 430 [2020] [internal quotation marks omitted]). Parking in front of a fire hydrant while one is at the wheel is not a moving violation, (see V.T.L. § 1202[b]; see also Thomas, 19 AD3d at 33), nor is it criminally suspicious.
As a result, the police's near-immediate temporary detention of Mr. Davis would require probable cause to believe he was operating the vehicle with unlawful tints. (See V.T.L. § 375[12-a][b]). However, tinted windows are not per se illegal. (See id.). Rather, only those windows over-tinted so much as to transmit less than "seventy percent" of light run afoul of the law. (See id.). As a result, officers cannot simply testify to their conclusion that windows were "excessively" tinted; rather, they must also provide the objective facts supporting that conclusion. "The legal test, according to the Court of Appeals, is whether the police officer reasonably believes the windows to be over-tinted in violation" of the law. (People v. Biggs, 208 AD3d 1340, 1344 [2d Dep't 2022]). Thus, an officer must explain why he thought the tints were "excessive"—and therefore, unlike other tints, unlawful—and a court must then review the [*3]reasonableness of that determination.
But an officer's mere conclusion that the windows were over-tinted will not do. "The assessment of whether there was probable cause . . . is to be made by the court upon consideration of all the relevant objective facts known to the officer; the subjective beliefs of the officer do not control the determination." (People v. Cooper, 38 AD3d 678, 679 [2d Dep't 2007]; see also People v. Bandera, 204 AD2d 340, 341 [2d Dep't 1994] [noting that the officer's subjective belief is irrelevant because "whether probable cause exists" is "for the court" to decide "upon a review of all relevant objective information known to the officer."]). "As on a warrant application, it is the responsibility of the neutral court, not the police, to determine whether the latter were justified in making the serious intrusion that the deprivation of another's liberty constitutes." (People v. Bouton, 50 NY2d 130, 135 [1980]). The police must present the court "with facts, not assurances." (People v. Dodt, 61 NY2d 408, 415 [1984]). "Summary statements that the police had arrived at a conclusion . . . will not do." (Bouton, 50 NY2d at 135).
The officer here testified that he observed "excessively dark window tints," but he did not provide any facts on which he based his conclusion that the tints were "excessive." An officer who only testifies that he concluded the tints were "excessively dark" might as well only testify that the tints were "unlawful." Such a hearing record leaves the court with no objective facts on which to adjudicate whether the officer's conclusion was "reasonabl[e]." (See Biggs, 208 AD3d at 1344). The People elicited nothing regarding the officer's training or experience in gauging tints, (see People v. Anonymous, 60 Misc 3d 405, 409 [Crim. Ct., Bronx County 2018]), or any factual observations that he made about the tints here, (see Biggs, 208 AD3d at 1344 [in which an officer testified that he "could not see into defendant's vehicle"]). If the court holds that the officer's mere conclusion is itself sufficient, then it would simply adopt the subjective assurances of the officer. That is not appropriate. It "is the responsibility of the neutral court, not the police, to determine whether the latter were [objectively] justified in making the serious intrusion that the deprivation of another's liberty constitutes." (Bouton, 50 NY2d at 135).
The court's responsibility to meaningfully review the factual basis for police conduct in situations like this is critical to preserving "the interest of individuals in living their lives free from governmental interference." (People v. Howard, 50 NY2d 583, 589 [1980]). Automobile stops alleging excessively tinted windows are common and can have major consequences. (See, e.g., Alysia Santo, The Marshall Project, When 'Broken Windows' Meets Tinted Windows, Aug. 17, 2015, https://www.themarshallproject.org/2015/08/17/when-broken-windows-meets-tinted-windows [noting that in 2014, the NYPD issued an average of 204 tickets for tinted windows each day, every day]; see also id. ["Critics see a law that disproportionately targets people of color and provides a pretext to churn revenue and fish for other violations or crimes."]; David D. Kirkpatrick et al., Why Many Police Traffic Stops Turn Deadly, NY Times, Oct. 21, 2021 ["The problem is especially acute at so-called pretextual stops, [Kalfani Ture, a criminologist and former police officer] argued, where officers seek out minor violations — expired registration, a dangling air freshener, tinted windows — to search a car they consider suspicious."]; Philip V. McHarris, The Nation, I Experience a Hollowing Fear Any Time I'm Stopped by Police, Nov. 19, 2020 ["Gutting the Fourth Amendment has turned tiny traffic violations into abusive traffic stops and coercive searches for millions of Black drivers like myself."]).
In fact, here the police intrusion based upon purportedly excessive tints escalated into violence against a New Yorker who was sitting peacefully in his own lawfully parked car. At the very least, a suppression court must fulfill its responsibility to determine whether an officer's conclusion that the tints were unlawful was reasonably warranted. The alternative—simply adopting the officer's conclusion—reduces the court to a rubber stamp.
Nonetheless, in December of 2022, the Appellate Term for the Second Department's 2nd, 11th, and 13th Districts concluded otherwise. (People v. Neklatov, 78 Misc 3d 1 [App. Term, 2d Dep't 2022]; but see id. at 6 [Weston, J., dissenting] [arguing that an officer's mere statement that he observed "excessively tinted windows" is alone insufficient because it is a conclusion that requires factual support]). This court is required to follow that decision. For that reason, and for that reason alone, the People here meet their burden to establish probable cause of a traffic violation and justification for the officers' temporary detention.
Constrained to find that the officers' detention was lawful, the court is likewise constrained to find that there was probable cause for the arrest. If the detention was lawful, Mr. Davis was not entitled to resist the officers' commands to lower his window or open his door. As a result, the People established probable cause for obstructing governmental administration.
The final matter is the inventory search. An inventory search is a search "designed to properly catalogue the contents of the item searched." (People v. Johnson, 1 NY3d 252, 256 [2003]). "The specific objectives of an inventory search, particularly in the context of a vehicle, are to protect the property of the defendant, to protect the police against any claim of lost property, and to protect police personnel and others from any dangerous instruments." (Id.). (It is decidedly not, as Officer Edwards testified, to locate any "contraband" including "drugs" or "things like that.") An inventory search may not be merely a pretext to search for evidence of a crime. (People v. Mortel, 197 AD3d 196, 214 [2d Dep't 2021]).
"The People bear the burden of demonstrating the validity of [an] inventory search." (People v. Padilla, 21 NY3d 268, 272 [2013]). They must show that the vehicle was "lawfully impounded at the time of the inventory search" and that the search "was conducted pursuant to standardized police procedures." (Mortel, 197 AD3d at 214).
The People here fail to establish that the vehicle was lawfully impounded at the time of the inventory search. "When the driver of a vehicle is arrested, the police may impound the car, and conduct an inventory search, where they act pursuant to reasonable police regulations relating to inventory procedures administered in good faith." (People v. Walker, 20 NY3d 122, 125 [2012] [internal quotation marks omitted]). The police may also impound a vehicle "[i]n the interests of public safety," or under what is often called their "community caretaking functions." (People v. Weeks, 182 AD3d 539, 541 [2d Dep't 2020] [internal quotation marks omitted]). Here, the People elicited no testimony or evidence that the police impounded the vehicle under any police regulations, let alone reasonable ones. They presented zero evidence as to whether the NYPD "had a policy regarding impoundment of vehicles, what that policy required, or whether the [police] complied with that policy when [they] impounded the defendant's vehicle." (Weeks, 182 AD3d at 541). Nor did they elicit any circumstances suggesting that the vehicle had to be [*4]impounded in the interests of public safety. That a car was in front of a fire hydrant does not suggest that it was reasonable for police to necessarily impound it, rather than simply moving it, to protect public safety.
In any event, the People also fail to establish that the police conducted the search pursuant to standardized police procedure. That burden is twofold. First, the People must establish that an applicable standardized police procedure existed at the time of the inventory search. (See People v. Johnson, 1 NY3d 252, 256 [2003]). Second, they must establish that the procedure was genuinely followed by law enforcement. (See People v. Gomez, 13 NY3d 6, 11 [2009]). An inventory search will not be upheld in the absence of evidence demonstrating "that th[e] particular officer[s] conducted th[e] search properly and in compliance with established procedures." (Johnson, 1 NY3d at 256; see also Mortel, 197 AD3d at 218). Thus, the People must establish that the officers involved actually abided by "an established procedure clearly limiting the conduct of individual officers that assures that the searches are carried out consistently and reasonably and do not become little more than an excuse for general rummaging to discover incriminating evidence." (People v. Galak, 80 NY2d 715, 719 [1993]). As part of this burden, the People must show that the inventory search in fact produced its "hallmark": a "meaningful inventory list." (Johnson, 1 NY3d at 256; see also People v. Gomez, 50 AD3d 407, 408 [1st Dep't 2008] [same]). Such a meaningful list must be "fully recorded in a usable format." (People v. Cabrera, 2024 NY Slip Op. 00685 [1st Dep't Feb. 8, 2024]).
Here, Officer Edwards indicated that multiple officers conducted the inventory search. However, he did not specify who those officers were, nor did he articulate how each of them reasonably followed the requirements of an inventory search. The point of an inventory search is to create an inventory of the items in a vehicle. That Officer Edwards instead explained the officers' general goal as "just trying to get — you know, find any contraband or valuable material," like "drugs" or "things like that," does not inspire much confidence that this search was conducted for the specific purpose of creating an inventory. This record is insufficient to assure the court that each of the officers "was not merely rummaging for incriminating evidence." (See Mortel, 197 AD3d at 221).
Moreover, while Officer Edwards testified that the items recovered in the inventory search "were invoiced" in an "itemized list of what we recovered," he admitted that he "wasn't the one who invoiced [the list]." Indeed, he did not provide any basis for his belief that an itemized list was created. And while he said that he could recognize "an invoice list," the People elicited no evidence that he had ever even seen the invoice list purportedly created in this case. The People did not introduce any such list into evidence.[FN1]
Nor did they elicit specific testimony about what was contained on that list, how it was created, when it was created, or who created it. [*5]The People do not meet their burden where their only testifying witness "did not take any part in the preparation of the inventory list that was later produced." (Mortel, 197 AD3d at 221). Without establishing that the police created a meaningful inventory list—the "hallmark of an inventory search"—suppression is required. (Gomez, 50 AD3d at 409). "On this record, 'the People failed to produce evidence demonstrating . . . that th[e] particular officer[s] conducted this search properly and in compliance with established procedures.'" (Mortel, 197 AD3d at 221 [quoting People v. Russell, 13 AD3d 655, 657 [2d Dep't 2004]]).
Accordingly, the Mapp/Dunaway motion is granted in part: the fruits of the inventory search, including any resulting police observations and the photocopied parking placard, are suppressed. In all other respects, the motion is denied.
The foregoing constitutes the order and decision of the court.
Dated: February 15, 2024
Queens, NY
Wanda L. Licitra, J.C.C.

Footnotes

Footnote 1: Notably, the People attempted and failed to introduce some property vouchers into evidence. If this is what the officer meant as an "invoice list," that would not likely have been sufficient, either. Separate NYPD property vouchers for items are not, collectively, an appropriate "inventory list." (People v. Gomez, 50 AD3d 407, 410 [1st Dep't 2008]). Were that the case, "the requirement that an inventory search produce an inventory list would be eviscerated." (Id.).